[No. C050376. Third Dist. June 29, 2007.]

KONSTANTIN KATIUZHINSKY et al., Plaintiffs and Appellants, v.
RONNIE ROSHONE PERRY et al., Defendants and Respondents.

COUNSEL

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos; Jaramillo & Borcyckowski and Amiel Jaramillo for Plaintiffs and Appellants.

Farmer, Murphy, Smith & Alliston, George E. Murphy, Suzanne M. Nicholson; Trimble, Sherinian & Varanini and Suzanne M. Trimble for Defendants and Respondents.

OPINION

**BUTZ, J.**—An injured plaintiff in a tort action cannot recover more than the amount of medical expenses he or she paid or incurred, even if the reasonable value of those services might be a greater sum. (*Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 641 [246 Cal.Rptr. 192] (*Hanif*); *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 306–307 [112 Cal.Rptr.2d 861] (*Nishihama*).) In both *Hanif* and *Nishihama*, the plaintiff's medical provider accepted payment for services from a third party[1] under a

---

[1] The third party in *Hanif* was Medi-Cal; it was Blue Cross in *Nishihama*.

contract that the provider would accept the third party's payment as payment in full, discharging the plaintiff from any further liability.

In this case, plaintiffs received services from medical providers who secured a lien against any recovery in plaintiffs' personal injury actions. Some of the providers later sold plaintiffs' accounts, at a discount, to a financial services company called MedFinManager California, L.L.C. (MedFin). The result was that the medical providers wrote off the balance but plaintiffs remained liable to MedFin for payment of their medical bills.

Relying on the rule of *Hanif* and *Nishihama*, the trial court forbade plaintiffs from recovering or introducing evidence of medical expenses beyond the discounted rate paid by MedFin to their medical providers. As a consequence, the jury was never allowed to consider the billed charges for medical care that plaintiffs incurred.

██ We shall conclude that the trial court did not correctly apply *Hanif* and *Nishihama*. The intervention of a third party in purchasing a medical lien does not prevent a plaintiff from recovering the amounts billed by the medical provider for care and treatment, as long as the plaintiff legitimately incurs those expenses and remains liable for their payment. Nor does the rule forbid the jury from considering the amounts billed by the provider as evidence of the reasonable value of the services. We shall reverse with directions.

## FACTUAL BACKGROUND

This case arises from injuries suffered by plaintiffs Konstantin Katiuzhinsky and Vera Kiryukhina in an automobile accident. Prior to trial, defendants filed a motion in limine to preclude the introduction of any evidence of medical expenses incurred above the amounts that MedFin paid to plaintiffs' health care providers to purchase their bills. As authority for their motion, defendants cited *Hanif, Nishihama* and the California Supreme Court case of *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595 [26 Cal.Rptr.3d 569, 109 P.3d 69] (*Parnell*).

The court held a hearing pursuant to Evidence Code section 402, at which evidence was introduced regarding the contractual arrangements between MedFin and the medical providers, primarily in the form of testimony by MedFin's founder and its co-owner, Joel Clapick. We summarize that evidence below.

*Evidence adduced at the Evidence Code section 402 hearing*

MedFin is a financial service company that purchases medical bills, and the liens securing them, from health care providers. It is not an insurance company. MedFin works with plaintiff personal injury law firms and with

doctors and hospitals. Typically, MedFin becomes involved in a situation where a plaintiff sustains injuries in a traffic accident and needs medical treatment, but has no health insurance.

Prior to treatment, the medical provider asks MedFin to evaluate the case to determine whether it is willing to purchase the medical account after the rendition of services. MedFin will then contact the plaintiff's attorney and gather information about the case to ascertain whether the plaintiff's claim against the tortfeasor is worth its investment.

If the claim meets with MedFin's approval, it notifies the medical provider that it is willing to purchase the account and the lien rights. MedFin and the medical provider have their own agreement that governs their rights and obligations. The contract usually stipulates that MedFin will purchase the bill for about 50 cents on the dollar. Before the plaintiff receives services, the plaintiff and his attorney execute a consensual lien in favor of the medical provider. After services are rendered, the medical provider notifies the parties to the lawsuit of its medical lien. (Civ. Code, §§ 3045.1–3045.6.)

MedFin does not negotiate with the plaintiff or the medical provider how much the provider charges for medical services. These sums are based on a standard fee schedule registered with the state, and are the same as any patient would incur in the ordinary course of business.

MedFin's agreement with the medical provider does not require the provider to sell its bill to MedFin. After the rendition of medical services, the provider decides whether or not to sell its account to MedFin. In some cases, a medical provider will retain the account for itself, in which case it can enforce its lien and collect the full amount due from the plaintiff.

If the medical provider does sell its account to MedFin, it executes a formal "Notice of Sale and Assignment," which is sent to the plaintiff. Having sold the bill and lien, the provider closes its book on the account. At that point, MedFin owns the account and assumes the entire expense and risk of collection. The plaintiff remains liable for the bill and owes MedFin the full amount of what has been charged. Once the plaintiff's case is resolved, MedFin typically gets paid quickly, since the plaintiff's attorney will ordinarily pay the lien from the recovery.

In the case of plaintiff Katiuzhinsky, Mercy General Hospital sold its $144,000 medical lien for approximately $72,000. Dr. Kali Eswaran sold MedFin his $2,955 bill for $1,477.50. Dr. Pasquale Montesano sold one bill for $13,860 to MedFin for $7,623, but retained others for himself. Several of

plaintiff Kiryukhina's bills were also purchased by MedFin at a discounted rate.

*Trial court's ruling*

The trial court ruled that as to the bills sold to MedFin, the only admissible evidence of plaintiffs' damages for medical expenses would be the amounts MedFin paid the medical providers to acquire their liens. On the other hand, bills that remained in the hands of the providers were allowed to be presented, as "the best evidence of what the charge is."

While acknowledging that plaintiffs were personally liable for the full amounts billed, the court viewed MedFin's purchase of the accounts as a "financing arrangement" rather than a purchase of a debt. Citing *Hanif* and *Nishihama,* the court reasoned that the sums paid by MedFin represented the actual amount the health care providers were willing to accept for their services. In the court's view, MedFin's role was the equivalent of a money lender. The difference between the amount MedFin paid for the account and the full amount of the bill was akin to a "finance charge," or money that plaintiffs were borrowing (apparently from MedFin) to finance their medical care. Nor, the court ruled, could plaintiffs recover the "finance charges" as consequential damages because such sums were, in the court's view, only a "contingent" liability.

*Trial and judgment*

In light of the court's ruling, counsel stipulated that, as to the medical bills purchased by MedFin, plaintiffs' evidence of medical expenses would be restricted to the discount rate that MedFin had paid to the medical providers to purchase their accounts.

The jury returned with a verdict of $304,669.19 for Katiuzhinsky, of which $169,669.19 represented medical expenses, and $176,141.91 for Kiryukhina, which included $76,141.91 in medical expenses.

## DISCUSSION

### I. Standard of Review

Defendants seek to gain an immediate advantage on appeal by claiming that the trial court's ruling must be reviewed under the deferential "abuse of discretion" test.

■ While trial judges ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1156 [46 Cal.Rptr.3d 780] (*Greer*)), a court's discretion is limited by the legal principles applicable to the case. (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1330 [104 Cal.Rptr.2d 116].) " 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25 [97 Cal.Rptr.2d 797], quoting *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704].) Thus, if the trial court's in limine ruling was based upon a misinterpretation of applicable law, an abuse of discretion has been shown.

## II.  *Hanif, Nishihama* and *Parnell*

In order to set the proper framework for review of the trial court's ruling, it is necessary to explore the trio of cases that it relied upon for its decision.

■ In *Hanif,* the trial judge in a bench trial awarded the plaintiff the "reasonable value" of medical services rendered, despite the fact that the hospital that billed for the expenses accepted a reduced sum from the plaintiff's Medi-Cal insurance and wrote off the balance. (*Hanif, supra,* 200 Cal.App.3d at p. 639.) This court first acknowledged that the normal measure of damages for a person injured by another's tortious conduct is "the reasonable value of medical care and services reasonably required and attributable to the tort." (*Id.* at p. 640.) Further, under the collateral source rule, a plaintiff must be allowed to recover medical costs, even if paid by a third party, such as health insurance. (*Id.* at pp. 639–640, citing *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6–16 [84 Cal.Rptr. 173, 465 P.2d 61].)

■ However, we held in *Hanif* that under basic principles of tort law, a plaintiff may not be placed in a better position than he would if the wrong had not been done. A damage award for past medical expenses in an amount greater than its actual cost "constitutes overcompensation" (*Hanif, supra,* 200 Cal.App.3d at p. 641). Therefore, "when the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care despite the fact it may have been less than the prevailing market rate." (*Ibid.*; see also *id.* at pp. 643–644.)

In *Nishihama*, the jury received evidence of the "normal rates" charged by the hospital for the care the plaintiff received, but she participated in a Blue Cross health plan, under which the hospital accepted a lesser amount from Blue Cross as payment in full for the services. The jury, unaware of this arrangement, awarded the plaintiff medical costs based on the hospital's "normal" rates. (*Nishihama, supra*, 93 Cal.App.4th at pp. 306–307.) Following *Hanif*, the court held that it was error for the jury to award a sum for medical expenses greater than the actual amount paid or incurred, and ordered the judgment modified. (*Id.* at p. 309.)

In *Parnell*, the plaintiff participated in a health plan, which contracted with a preferred provider organization (PPO) to give discounts on medical care to its beneficiaries. Parnell received treatment at a hospital that was a preferred provider, and which accepted the discounted rate as " 'payment in full,' " pursuant to the hospital's agreement with the PPO. (*Parnell, supra*, 35 Cal.4th at pp. 598–599.) The hospital then filed a notice of lien against Parnell's tort claim, attempting to recover the difference between the "cost" of its medical services and the amount it received under the plaintiff's health care contract. (*Id.* at p. 599.)

■ The California Supreme Court held that, because a lien under California's Hospital Lien Act (HLA) (Civ. Code, §§ 3045.1–3045.6) "is simply a legal claim upon the property of another in satisfaction of a debt *owed by a patient* for medical services provided by the lien claimant" (*Parnell, supra*, 35 Cal.4th at pp. 607–608, italics added), the hospital could not recover more than the amount it accepted as payment in full. Stated the court, "Because Parnell no longer owes a debt to the hospital for its services, we conclude that the hospital may not assert a lien under the HLA against Parnell's recovery from the third party tortfeasor." (*Id.* at p. 609.)

### III. The Trial Court's Ruling

#### A. *Error in Excluding Evidence*

■ The trial court's ruling did not merely preclude plaintiffs from recovering special damages for medical expenses above the discounted rate paid by MedFin, but kept the jurors from considering the medical bills as *evidence* of the reasonable value of the medical services. This ruling was erroneous. In *Greer*, we made clear that, notwithstanding the limits they may place on a plaintiff's *recovery* of medical expenses, neither *Nishihama* nor *Hanif* "holds that *evidence* of the reasonable cost of medical care may not be admitted." (*Greer, supra*, 141 Cal.App.4th at p. 1157.) Indeed, although the

*Nishihama* court reduced the medical award, it found no error in allowing the jury to receive evidence of the hospital's customary charges, noting that it was probably a more accurate indicator of the extent of the plaintiff's injuries than the specially negotiated rates obtained by Blue Cross. (*Greer, supra,* at p. 1157, citing *Nishihama, supra,* 93 Cal.App.4th at p. 309.)

Thus, regardless of whether defendants were entitled to a *Nishihama*-type *reduction* of the medical damage award, there was no basis in law to prevent the jurors from receiving evidence of the amounts billed, as they reflected on the nature and extent of plaintiffs' injuries and were therefore relevant to their assessment of an overall general damage award.

## B.   *Error in Limiting Recovery*

Relying on *Hanif, Nishihama* and *Parnell,* the trial court decided that, because the health care providers that sold their accounts to MedFin knew *before treatment* that MedFin would be willing to purchase their bills, the providers had, in effect agreed to accept a reduced amount for their services, and such reduced amount was the maximum that plaintiffs could recover for medical expenses. In the trial court's view, by selling an account receivable to MedFin and writing off the balance, the medical providers manifested a willingness to accept a discounted rate for their services, just as the providers did in *Hanif* and *Nishihama.*

However, there are several important differences between the cases relied upon by the trial court and this one. First, unlike the circumstances in *Hanif, Nishihama* and *Parnell,* plaintiffs here remain fully liable for the amount of the medical provider's charges for care and treatment. The principle of law for which *Hanif* and *Nishihama* stand is that a plaintiff's recovery should be limited to "the actual amount he paid *or for which he incurred liability* for past medical care and services." (*Hanif, supra,* 200 Cal.App.3d at p. 640, italics added; see also *Nishihama, supra,* 93 Cal.App.4th at p. 306; *Greer, supra,* 141 Cal.App.4th at p. 1154.) The point is crucial, for those decisions rest on the principle that a damage award should not place a tort plaintiff in a " 'better position' " than if the wrong had not been done. (*Hanif, supra,* 200 Cal.App.3d at p. 641, quoting *Valdez v. Taylor Automobile Co.* (1954) 129 Cal.App.2d 810, 821–822 [278 P.2d 91].) Under the trial court's ruling, plaintiffs are placed in a *worse* position than had the tort not been committed. Despite the fact that plaintiffs are liable for the full amount of the medical bills, the tortfeasor is answerable only for a discounted rate paid by a bill collector that bought the lien from a health care provider. The result is that plaintiffs are *undercompensated* and the tortfeasor receives a windfall.

■ Second, while the medical providers could opt to sell their bills to MedFin, they were under no obligation to do so. Whether sold to MedFin or not, the charges billed to plaintiffs reflected on the reasonable value of the services they received. A subsequent assignment of the bill to a third party cannot result in a *decrease* in the value of services that have already been rendered. Yet that is exactly the effect of the trial court's ruling.

The trial court characterized plaintiffs' liability for the difference between what MedFin paid for the bills and the charges plaintiffs incurred as a "finance charge." According to this line of reasoning, MedFin was nothing more than a money lender to plaintiffs, financing their medical care, and allowing them to pay back over time.

But plaintiffs did not contract with MedFin to purchase medical care. Indeed, as the trial court recognized, plaintiffs had *no interaction* with MedFin. Plaintiffs' only contractual relationship was with their health care providers. Plaintiffs agreed not only to pay the charges billed but gave the providers a lien to secure the debt. Unlike the situations in *Hanif* and *Nishihama*, the payment to the medical providers did nothing to extinguish plaintiffs' liability for the treatment they received. And unlike *Parnell*, plaintiffs' financial obligation remained intact after the rendition of services. Therefore, allowing plaintiffs to recover medical expenses for which they, and they alone, are responsible does not overcompensate them for the economic damage sustained as a result of the accident.[2]

Defendants argue that because the health care providers extended services only after they were assured they could later sell their bills at a discount to MedFin, the discounted rate paid to MedFin represents a more accurate reflection of the reasonable value of the services than the amounts billed.

---

[2] Defendants' reliance on the case of *Glaire v. La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915 [117 Cal.Rptr. 541, 528 P.2d 357] does not advance their argument. There, a health club and finance company were interlocking corporations under common ownership and control. The club charged an ostensible flat rate for a seven-year membership, regardless of whether the member paid in advance or in monthly installments, under a contract that recited there was no "service charge" for the extension of credit. The club routinely sold the account to its finance corporation at a discount and pocketed the difference. (*Id.* at p. 918.) The California Supreme Court held the complaint sufficient against a demurrer based on violation of federal truth-in-lending statutes and state usury law, ruling that the entire transaction could be viewed as a concealed and usurious financing scheme. (*Id.* at pp. 919–927.)

Here, there is nothing to suggest that MedFin and the health care providers were not conducting business in good faith and at arm's length. Moreover, whatever light *Glaire* may shed on usury or truth-in-lending law, it is of no help in determining whether the amounts charged to plaintiffs and liened to their health care providers are relevant to and recoverable as the reasonable cost of those services.

They contend that allowing plaintiffs to recover the full amounts billed would have given the jury an artificially inflated view of the value of the services rendered.

This reasoning is faulty. Unlike the *Hanif* line of cases, the medical provider is under no legal compulsion to accept MedFin's payment as full compensation for treating plaintiffs. More importantly, if and when the provider decides to sell its bill to MedFin and write off the balance, each party receives something of value: The provider obtains immediate payment and transfers the expense of collection and the risk of nonpayment onto someone else; MedFin, in turn, acquires the medical bill as well as the lien securing it, and will make a profit if it is successful in its collection efforts.

The fact that a hospital or doctor, for administrative or economic convenience, decides to sell a debt to a third party at a discount does not reduce the value of the services provided in the first place. Moreover, the bills are not inflated due to MedFin's involvement. MedFin has no control over what the providers charge for their services, which are billed out at the usual and customary rates.

■  We conclude that the trial court erred in limiting recovery of special damages for medical expenses to the amounts paid by MedFin to purchase plaintiffs' accounts. Plaintiffs should have been permitted to present evidence of the amounts charged to and incurred by them, and to argue to the jury that these amounts represented the reasonable value of the medical services provided.

Nothing in our decision should be taken to mean that evidence a health care provider subsequently sold its bill to MedFin is inadmissible. That issue is not before us and we do not address it.

## C.  *Prejudice*

The trial court's in limine ruling, placing an artificial limit on the amount of recoverable medical expenses was obviously prejudicial. In most cases, the actual cost of plaintiffs' medical care was twice the amount MedFin paid for the bills. Given the number of accounts sold and the size of the bills, the difference added up to thousands of dollars. There is little doubt that the erroneous limit on the amount of recoverable special damages had a significant effect on the jury's overall damage award. Plaintiffs are entitled to a new trial on the issue of damages.

## DISPOSITION

The judgment is reversed. The cause is remanded for a new trial on the issue of damages in a manner consistent with the views expressed herein. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)

Scotland, P. J., and Robie, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 25, 2007, S155272.