Filed 10/28/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ANNA USPENSKAYA, | C071647 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201000075591CUPAGDS) |
| v. | |
| CLARE MELINE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Brian R. Van Camp, Judge. Affirmed.

Dentons US LLP and Michael A. Barnes for Defendant and Appellant.

Shore, McKinley & Conger, LLP, and Aaron S. McKinney for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I and II-A of the discussion.

1

Defendant Clare Meline appeals from the entry of judgment on a jury verdict finding her negligent and awarding plaintiff Anna Uspenskaya $261,713.71 in past medical expenses.

This case raises an issue in the evolving body of case law on the calculation of reasonable medical expenses in economic damages awards. Plaintiff lacked medical insurance and contracted with her medical providers to treat her in exchange for a lien on whatever she might recover from defendant in this lawsuit. A third party assignee, MedFin Managers, LLC (MedFin), purchased the lien from the medical providers for a discounted amount. Plaintiff remained liable on the total bill. Defendant contends that the trial court erred in denying her motion to admit evidence of the amounts MedFin paid to purchase the right to recover the full amounts plaintiff's medical providers billed plaintiff. Defendant argues that the trial court should have allowed her to introduce evidence of the amounts MedFin paid to the medical providers (the MedFin payments) as evidence of the reasonable cost of treatment provided plaintiff, particularly since the court denied defendant's motion to exclude evidence of the billed amounts.

In the published portion of this opinion, we conclude that because defendant proffered no evidence to show that the MedFin payments represented the reasonable value of plaintiff's treatment, the probative value of that evidence was substantially outweighed by the probability that it would create a substantial danger of undue prejudice as well as a danger of confusing and misleading the jury. Consequently, the trial court's Evidence Code section 352[1] ruling precluding evidence of the MedFin payments was not an abuse of discretion.[2]

---

[1] Undesignated statutory references are to the Evidence Code in effect at the time of the trial.

[2] In the unpublished portion of this opinion, we conclude that defendant's offer of proof regarding the amounts MedFin paid, at least as to Sutter, was sufficient to preserve the issue of the admissibility of the MedFin payments for appeal.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant's vehicle collided into plaintiff's vehicle at a busy intersection. Plaintiff sustained spinal injuries in the accident and filed suit against defendant. Eventually, plaintiff had surgery to repair a herniated lumbar disc.

The jury found defendant negligent and awarded plaintiff a total of $429,773.71 in damages, including $261,773.71 in past medical expenses, which was the full amount of her medical bills.[3] The trial court then entered judgment on the verdict.

## DISCUSSION

### I. Additional Background and Defendant's Contentions

Because plaintiff did not have medical insurance, she entered into agreements with her medical providers, including Sutter Memorial Hospital (Sutter) and her treating physician, Dr. Philip Orisek, to repay the full amount of her medical bills, secured by liens on her claims against defendant. The agreements each provided that plaintiff is "DIRECTLY, PERSONALLY, AND FULLY responsible to make payment in full" to the medical providers or their assignees regardless of the outcome of the lawsuit. While the agreements contemplated that the medical providers' contractual rights to payment could be assigned to a third party, MedFin was not a party to any of these agreements. However, at some point, MedFin purchased the liens against plaintiff from Sutter and Dr. Orisek. Plaintiff's medical bills totaled $261,713.71.

Defendant filed a motion in limine to exclude any evidence of the amounts actually billed by the medical providers (the billed amounts). Defendant argued that because MedFin, a third party who purchases accounts receivable from medical

---

[3] The jury also found plaintiff negligent and assigned her 20 percent fault for the collision and plaintiff's award was reduced accordingly. The amount on the verdict form appears to be $60 more than the stipulated amount of medical expenses for an unknown reason.

3

providers, had purchased both Sutter's and Dr. Orisek's liens for less than the billed amounts, the amounts actually paid for those liens should be the only admissible evidence of the reasonable value of plaintiff's medical services. Defendant also contended that under *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*), the medical bills are irrelevant and plaintiff should be precluded from presenting them to the jury or in any manner referring to the bills. Thus, defendant sought "an order that plaintiff shall not introduce or reference in any fashion the billing statements or amounts for medical care provided beyond those amounts that were accepted by the providers as payment in full."

In plaintiff's opposition, she explained that MedFin "is a financial services company" that purchases "lien-based accounts receivable from healthcare providers. Significantly, the services provided by MedFin are directed to healthcare providers as opposed to patients, insureds or subscribers." Plaintiff further explained that "[t]he medical provider is under no obligation to sell its account to MedFin at a reduced rate. It may choose to hold onto the account in the hope that [p]laintiff's lawsuit will be successful or it may choose to sell the account to MedFin (or any other company) at a discount for various reasons, *e.g.*, certainty of recovery of money, quicker receipt of the money, reduced collection costs, no issue of collectability, etc. The medical provider is able to shift all the risk of collectability to MedFin." Plaintiff stated that her medical providers "entered into separate agreements with MedFin whereby these providers assigned the right to the money owed by [plaintiff], pursuant to the liens she executed in favor of these providers, to MedFin. In exchange, MedFin paid cash to these providers. [Plaintiff] still owes the full amount of the medical charges billed by these providers; the right to receive that money is now owned by MedFin." Based on this offer of proof, plaintiff contended that her case was distinguishable from *Howell*, where the plaintiff was insured and did not owe medical providers or their assignees any further payment (see *Howell*, *supra*, 52 Cal.4th at p. 549), and exactly like the situation in this court's opinion

in *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288 (*Katiuzhinsky*). Plaintiff pointed out that in *Howell*, the California Supreme Court cited *Katiuzhinsky* with approval, distinguishing it based on the fact that the plaintiff in that case remained liable for the full amount. (See *Howell*, at p. 554.)

Citing *Katiuzhinsky*, the trial court stated during the hearing that "to limit a plaintiff from presenting the amount that she is still responsible for to [MedFin] would give the tortfeasor the benefit of the reduced amount . . . plaintiff's health care provider accepted . . . but would leave the plaintiff still exposed to paying a larger amount. [¶] . . . [¶] [I]f she wins something, then I think [MedFin] has every reasonable expectation that they are going to get something above what they . . . laid out to the doctors." Defense counsel admitted that in *Howell*, the plaintiff's "prospect of liability was limited to the amounts [her] insurance company had agreed to pay the providers for the services they were to render," and accordingly, the plaintiff never "incurred the full charges." After taking the matter under submission, the court denied the motion, citing *Katiuzhinsky*.

Defendant then moved to introduce evidence of the amounts MedFin paid to plaintiff's medical providers. Defendant proposed to introduce the testimony of the billing administrators for Sutter and Dr. Orisek to establish the MedFin payments. Defense counsel suggested that plaintiff's counsel might stipulate to the introduction of deposition transcripts in lieu of their testimony; however, plaintiff's counsel never indicated whether he would do so. Additionally, defense counsel explained that while the hospital administrator disclosed the amount MedFin paid to the hospital during the deposition, Dr. Orisek's administrator refused to disclose the amount Dr. Orisek was paid on the basis that it was a trade secret. Defendant did not propose to admit any other related evidence of the MedFin payments or any expert testimony that the MedFin payments reflected a reasonable valuation of plaintiff's treatment.

Plaintiff's counsel contended that the MedFin payments were inadmissible under the collateral source rule. During argument, the parties disclosed that they had entered into a stipulation as a result of the trial court's first ruling on defendant's motion in limine, that the billed amounts were "reasonable in amount and were incurred by plaintiff." Defense counsel then stated that he did not have "any evidence to present through expert testimony that the bills as charged are not reasonable." However, he further stated that the defense "entered into the stipulation with the understanding that following entry of the verdict, if the circumstances warrant, I can present the Court with the motion to reduce the verdict to the amount of the medical expenses actually paid and accepted."[4]

The discussion then returned to defendant's motion to admit evidence of the MedFin payments, and defense counsel asked to "introduce evidence of the actual amounts paid so the jury can consider that as evidence of the reasonableness." Plaintiff's counsel contended that *Howell* did not abrogate the collateral source rule and post-*Howell*, defendants still "cannot introduce evidence that [the medical bills were] paid by a source wholly independent of the tortfeasor; that violates the collateral source rule." The court deferred ruling on the motion.

Prior to the defense's case in chief, the parties resumed argument about the admissibility of the MedFin payments. The court ruled that the collateral source rule does not apply because plaintiff's "indebtedness was not lifted by a third party payment." The court then reasoned that even though the proposed evidence was likely "relevant to the issue of the reasonable costs" of plaintiff's medical care, it was just a "raw ball number" and would be problematic for the jury because the jury would have to speculate as to whether that number is a reasonable valuation. The court said it believed defense counsel wanted to present evidence of the MedFin payments to show the jury a number

---

**4** Defendant did not bring a post-trial motion to reduce the damages award.

as a starting point and explained, "The problem with that analysis is it leaves out of the picture the -- what, a dozen factors that the Howell case cited." The court noted that "there are a lot of other reasons that went into the fixing of the price at whatever they chose," such as the assurance of receiving some payment and volume discounts.

The court then reasoned that without some evidence, such as an expert witness, to explain why that number was a reasonable valuation of plaintiff's medical expenses, the proposed evidence would lead the jury to speculate. The court explained that the ruling would be different if defendant proposed to offer some evidence showing that the MedFin payments represented the reasonable value of plaintiff's medical services: "[W]ith an expert on this thing, tee it up and take it away . . . . Here's what [the medical providers] accepted, and I think that's reasonable because I looked at the charges made by other providers in this region, and, you know, at bottom, that's a reasonable cost. . . . [¶] But that person is not going to show up at trial." Defense counsel conceded he did not have an expert to address reasonable valuation. Accordingly, the court stated its tentative ruling would be to deny defendant's motion to introduce the evidence. However, the court indicated it would be willing to hear further argument and briefing if either of the parties wished to argue the matter further. Defense counsel stated he would accept the court's tentative ruling because he did not have anything further to add.

On appeal, defendant contends that the trial court erred in denying her motion to introduce evidence of the MedFin payments to establish the reasonable valuation of plaintiff's medical expenses. Defendant argues that because the court admitted the evidence of the billed amounts while excluding evidence of the MedFin payments, "the Court itself effectively determined [] that the [b]illed [a]mounts represented the reasonable value of [plaintiff's] surgery." Thus, defendant contends the trial court abused its discretion in denying defendant's motion to admit relevant evidence. We disagree.

7

## II.  Analysis

### A.  Offer of Proof

As a preliminary matter, plaintiff contends that defendant failed to provide a sufficient offer of proof as to the MedFin payments to preserve the issue for appeal:  "The reference to 'information' that counsel 'learned' at a deposition does not constitute a valid offer of proof."  Conversely, defendant contends that she adequately provided the substance, purpose, and relevance of the proposed testimony by stating that "she planned to use testimony from the medical providers' billing administrators to establish that the providers accepted less than the [b]illed [a]mounts for services."

Section 354, subdivision (a), provides:  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:  [¶]  (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means."  "An offer of proof is a statement by counsel describing proposed evidence and what he or she intends to prove if such evidence is admitted. [Citation.]"  (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1113 (*Gordon*).)  "The substance of evidence to be set forth in a valid offer of proof means the testimony of specific witnesses, writings, material objects, or other things presented to the senses, to be introduced to prove the existence or nonexistence of a fact in issue."  (*United Sav.· & Loan Assn. v. Reeder Dev. Corp.* (1976) 57 Cal.App.3d 282, 294.)  "An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice.  [Citation.]  To accomplish these purposes an offer of proof must be specific.  It must set forth the actual evidence to be produced and not merely the

8

facts or issues to be addressed and argued. [Citations.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53 (*Schmies*).)

Here, defense counsel proposed to introduce the testimony of the billing administrators for Sutter and Dr. Orisek to establish the amount of money MedFin paid to purchase plaintiff's accounts receivable for the jury to consider as evidence of the reasonable value of plaintiff's medical services. He explained that he obtained the information during the recent depositions of the billing administrators. While defendant did not provide the names of these witnesses or the specific amount MedFin paid to Dr. Orisek, defense counsel did provide the amount MedFin paid to Sutter, described the nature and relevance of the proposed testimony, and identified the witnesses by their job titles. In other words, defense counsel "describe[d] proposed evidence and what [he intended] to prove." (*Gordon*, *supra*, 170 Cal.App.4th at p. 1113.) Accordingly, we conclude that the trial court had sufficient notice of the substance, purpose, and relevance of the proposed evidence to make an informed ruling (at least as to the payments to Sutter), and the information given to the trial court provides us with sufficient means to determine error. (*Schmies*, *supra*, 44 Cal.App.4th at p. 53.)

**B. Exclusion of Evidence under Evidence Code Section 352**

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) We review a challenge to a trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) We will not disturb a trial court's exercise of discretion " 'except on a showing the trial court exercised its

9

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Holford* (2012) 203 Cal.App.4th 155, 168.) "While the concept 'abuse of discretion' is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded ' "the bounds of reason, all of the circumstances before it being considered. . . ." ' [Citations.]" (*Troxell v. Troxell* (1965) 237 Cal.App.2d 147, 152.) "A decision will not be reversed merely because reasonable people might disagree." (*People v. Preyer* (1985) 164 Cal.App.3d 568, 573-574.)

The purpose of an award of economic damages, such as medical expenses, is to compensate the plaintiff for the loss or injury sustained as a result of the tortfeasor's action; the object is to restore the plaintiff as nearly as possible to his or her former position, without placing the plaintiff in a better position than he or she would have been in had the wrong not occurred.[5] (See Civ. Code, § 1431.2, subd. (b)(1); *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 641.) "A person who undergoes necessary medical treatment for tortiously caused injuries suffers an economic loss by taking on

---

[5] We note that the collateral source rule is an exception to this general rule, allowing the plaintiff to recover the reasonable value of medical services rendered even where the medical bills were paid by a third party source, such as an insurer. (*Howell*, *supra*, 52 Cal.4th at p. 551.) The collateral source rule states that " 'if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.' " (*Id.* at p. 551, quoting *Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) "[T]he collateral source rule ensures plaintiffs will receive the benefits of their decision to carry insurance and thereby encourages them to do so. [Citation.] Since insurance policies frequently allow the insurer to reclaim the benefits paid out of a tort recovery by refund or subrogation, the rule, without providing the plaintiff a double recovery, ensures the tortfeasor cannot 'avoid payment of full compensation for the injury inflicted . . . .' [Citation.]" (*Howell*, at p. 551.) As the trial court properly ruled, the collateral source rule is inapplicable in this case because plaintiff did not receive compensation from MedFin nor did MedFin pay her medical bills on her behalf. On the contrary, she still owes MedFin the full billed amounts pursuant to the liens.

liability for the costs of treatment. Hence, any reasonable charges for treatment the injured person has paid or, having incurred, still owes the medical provider are recoverable as economic damages." (*Howell*, *supra*, 52 Cal.4th at p. 551.) However, a plaintiff "cannot recover more than the amount of medical expenses he or she paid or incurred, even if the reasonable value of those services might be a greater sum." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1290.) Additionally, an injured plaintiff with insurance may not recover more than the amount actually paid by her insurer on her behalf. (*Howell*, at p. 566.) However, "[t]he intervention of a third party in purchasing a medical lien does not prevent a plaintiff from recovering the amounts billed by the medical provider for care and treatment, as long as the plaintiff legitimately incurs those expenses and remains liable for their payment." (*Katiuzhinsky*, at p. 1291.) The result is different when a plaintiff has been relieved of having to pay the full cost of treatment as in *Howell*, where reduction of economic damages was appropriate because the defendant established by affidavit from both medical providers that the plaintiff had no remaining liability, that the negotiated rate differential was " 'written off' " or "waived," and that the providers would not pursue collection of the written-off amounts. (*Howell*, at p. 550.)

Defendant frames this appeal as a question of first impression in California courts related to the aforementioned established principles: "whether the amounts a medical provider accepts from a non-insurer third-party are admissible as evidence of the reasonable value of the service." While this is an interesting question and one that this court expressly left open in *Katiuzhinsky*,[6] the trial court did not rule that the MedFin payments are categorically inadmissible evidence on the question of the reasonable value of medical expenses. Rather, the trial court found the evidence was relevant to the

---

[6] In *Katiuzhinsky*, this court noted, "Nothing in our decision should be taken to mean that evidence a health care provider subsequently sold its bill to MedFin is inadmissible. That issue is not before us and we do not address it." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1298.)

question of reasonable value. However, the court ruled that without any evidence tending to show that the MedFin payments represented a reasonable value of the treatment provided, evidence of those amounts was likely to confuse the jury and cause the jury to speculate. The court explained that it would have admitted the testimony about the amount MedFin paid if defendant could present some evidence that that amount reflected a reasonable valuation of plaintiff's medical services.

We agree with the trial court's ruling, although for slightly different reasons.[7] The MedFin payments are relevant because they have a *tendency* in reason to prove reasonable value.[8] However, without evidence that those payments represented a reasonable value for the treatment, the probative value of that evidence as to reasonable value was minimal. On the other side of the section 352 balancing analysis, there was a substantial danger of undue prejudice and that the evidence of the MedFin payments would confuse or mislead the jury. These dangers substantially outweighed any probative value that evidence of the payments may have had. (§ 352.)

In *Katiuzhinsky*, MedFin purchased the right to collect on the debts injured plaintiffs owed their health care providers (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1291), just as it did in the instant case. This court explained the mechanics of how MedFin works: "Prior to treatment, the medical provider asks MedFin to evaluate the case to determine whether it is willing to purchase the medical account after the rendition

---

[7] We review the correctness or incorrectness of the trial court's ruling, not the reasons for the ruling. (*People v. Superior Court* (*Chapman*) (2012) 204 Cal.App.4th 1004, 1011; *People v. Baker* (2008) 164 Cal.App.4th 1152, 1156.) "We will affirm the trial court's ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those given by the trial court." (*People v. Evans* (2011) 200 Cal.App.4th 735, 742.)

[8] " 'Relevant evidence' means evidence . . . having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210, italics added.)

of services. MedFin will then contact the plaintiff's attorney and gather information about the case to ascertain whether the plaintiff's claim against the tortfeasor is worth its investment. [¶] If the claim meets with MedFin's approval, it notifies the medical provider that it is willing to purchase the account and the lien rights. . . . [¶] MedFin does not negotiate with the plaintiff or the medical provider how much the provider charges for medical services. These sums are based on a standard fee schedule registered with the state, and are the same as any patient would incur in the ordinary course of business." (*Id.* at p. 1292.)

The problem in cases involving MedFin, or similar companies purchasing accounts receivable (sometimes referred to as factors), is that MedFin's purchase price represents a reasonable approximation of the *collectability of the debt* rather than a reasonable approximation of the *value of the plaintiff's medical services*. In other words, the health care providers evaluate the risk of collectability and make a decision to settle for some amount that may or may not reflect the actual value for those services. As this court noted in *Katiuzhinsky*, "when the provider decides to sell its bill to MedFin and write off the balance, each party receives something of value: The provider obtains immediate payment and transfers the expense of collection and the risk of nonpayment onto someone else; MedFin, in turn, acquires the medical bill as well as the lien securing it, and will make a profit if it is successful in its collection efforts. [¶] The fact that a hospital or doctor, for administrative or economic convenience, decides to sell a debt to a third party at a discount does not reduce the value of the services provided in the first place." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1298.) In deciding what price to offer medical providers for the right to recover full payment from an injured person, MedFin evaluates the risk of collectability and bets on whether and how much the person will receive in a pending lawsuit. Given these reasons for selling and purchasing the right to collect the debt, the probative value of the MedFin payments on the question of the reasonable value of the treatment provided to plaintiff is at best limited without some

13

evidence tending to show a nexus between the purchase price for the right to collect the debt and the reasonable market value of the medical services. As our Supreme Court held in *Howell*, even if evidence of payments is relevant, "under Evidence Code section 352 the probative value of a collateral payment must be 'carefully weigh[ed] . . . against the inevitable prejudicial impact such evidence is likely to have on the jury's deliberations.' " (*Howell*, *supra*, 52 Cal.4th at p. 552, quoting *Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 732.) While the potential prejudice in the context of this case is different from that in *Howell and Hrnjak*, section 352 nevertheless applies. Indeed, the danger of prejudice is even greater here, where the injured plaintiff remains liable for the entire amount billed for the medical services she received. There is a substantial danger of prejudice because a jury could rely solely on a third party payment to fashion its award, which might not represent the reasonable value of a plaintiff's treatment and result in a situation where the plaintiff is not made whole, but rather remains liable to the third party for the entire debt, including the difference between the billed amounts and the amounts paid to the providers to purchase the debt.

A related section 352 concern is implicated here. Defendant proposed to admit the amount MedFin paid as her only evidence of the reasonable value of plaintiff's medical services. As the trial court ruled, this was the type of evidence that could lead the jurors astray and cause them to speculate about whether the MedFin payments represent the reasonable value of treatment without any foundational basis for doing so. Thus, the evidence of the MedFin payments, without additional testimony, presented a substantial danger of misleading the jury to conclude that the MedFin payments were a reasonable valuation of the medical services rather than a reasonable valuation of plaintiff's likelihood to pay her debt. (Cf. *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307-1309 [upholding trial court's exclusion of mold spore data as more prejudicial than probative and likely to confuse the jury where there was no evidence linking the data to the issue of whether the plaintiffs were exposed to mycotoxins in the mold].)

In arguing that the MedFin payments should have been admitted as evidence of the reasonable value of plaintiff's treatment, defendant relies on *Howell*, *supra*, 52 Cal.4th 541, *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*), and *Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311 (*Bermudez*). As we explain, these cases do not help defendant.

In *Howell*, pursuant to a preexisting agreement, the provider of the plaintiff's medical treatment accepted from plaintiff's health care insurer as payment in full an amount less than the amount the provider had billed. (*Howell*, *supra*, 52 Cal.4th at p. 548.) Our high court held that plaintiff's economic damages did not include the undiscounted sum stated in the provider's bill but never paid by her or on her behalf. The court reasoned that plaintiff suffered no economic loss since the discounted payment was accepted as payment in full. (*Ibid*.) Unlike the plaintiff in *Howell*, plaintiff here has sustained economic loss beyond the amount MedFin paid because she is still liable for the total amount of her debt. Of particular note is the following observation the *Howell* court made concerning the admissibility of evidence of payments accepted by a medical provider from an insurer: "when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses *and, assuming it satisfies other rules of evidence*, is admissible at trial." (*Id*. at p. 567, italics added.) Thus, even in the health care insurance context, where the amount paid is accepted as payment in full, our high court recognizes that the amount accepted by the medical provider, while relevant, may still not be admissible for other evidentiary reasons.

In *Corenbaum*, like in *Howell*, the plaintiffs' medical providers accepted from plaintiffs' health care insurers, pursuant to prior agreements, less than the full amount of their medical billings as payment in full for their services. (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1318-1319.) The *Corenbaum* court held that evidence of the full

15

amounts billed for plaintiffs' medical care was not relevant to the amount of damages for past medical services, because such amounts do not necessarily reflect the reasonable value of the medical services. (*Id.* at pp. 1319, 1330-1331.) The *Corenbaum* court went on to read *Howell* to state "that the negotiated rate *may be the best indication* of the reasonable value of the services provided and that it is unclear how any other 'market value' could be determined." (*Corenbaum*, at p. 1326, italics added.[9]) Apparently relying on this language, appellate counsel for defendant asserted at oral argument that the *Corenbaum* court interpreted *Howell* "to state that the amounts actually accepted by a medical provider are *quote the best evidence of the value of a medical service*." Counsel also asserted that *Bermudez, supra,* 237 Cal.App.4th 131, interpreted *Howell* in the same way. Thus, according to defendant, the trial court here excluded the *best evidence* of reasonable value. Neither the opinion in *Corenbaum* nor *Bermudez* contain the asserted quotation or use the words "best evidence." Rather, the *Corenbaum* court stated that discounted payments negotiated by health insurers "*may be* the best indication" of reasonable value. (*Corenbaum*, at p. 1326, italics added.)

In *Bermudez*, the plaintiff was uninsured. (*Bermudez, supra,* 237 Cal.App.4th at p. 1324.) At trial, the plaintiff testified that his medical providers would be paid out of any recovery he might receive in the case, but he would be responsible for the bills no matter the outcome of the trial. (*Ibid.*) The plaintiff introduced evidence of his medical providers' billings and sought to support his claim that the billings reflected the

---

[9] The *Corenbaum* court's reading came from the following quotation from *Howell*: " 'pricing of medical services is highly complex and depends, to a significant extent, on the identity of the payer. In effect, there appears to be not one market for medical services but several, with the price of services depending on the category of payer and sometimes on the particular government or business entity paying for the services. Given this state of medical economics, *how a market value other than that produced by negotiation between the insurer and the provider could be identified is unclear.*' " (*Corenbaum, supra,* 215 Cal.App.4th at p. 1327, quoting *Howell, supra,* 52 Cal.4th at p. 562.)

reasonable value of his treatment with expert testimony. (*Id*. at pp. 1324-1326.) The jury awarded economic damages for the total amount of the medical bills. Defendant contended on appeal that there was insufficient evidence supporting the reasonableness of the billings. (*Id*. at p. 1316.) The *Bermudez* court concluded the evidence was sufficient to support the jury's findings except for a small portion of the billings that was not supported with expert testimony.[10] (*Id*. at pp. 1337-1338.)

Neither *Howell*, *Corenbaum*, nor *Bermudez* help defendant here. This case does not involve a transaction between the buyer of health care treatment (the injured party and that person's health care insurance carrier) and the seller of that treatment (the health care provider). It involves the sale of an asset -- the right to collect the injured person's debt -- to a third party buyer unrelated to the person who has been injured. Unlike a situation involving payments made by a plaintiff's health care insurer, plaintiff had no agreement or prior relationship with MedFin, and the payments made by MedFin to the providers were not made on plaintiff's behalf to pay for her treatment. And, as we have discussed, the amount MedFin paid is not necessarily based on the reasonable value of the health care, but rather on collectability factors that are unrelated to reasonable value.

Furthermore, unlike the plaintiffs in *Howell* and *Corenbaum*, the injured plaintiff here is still on the hook to pay the entire debt, including the differential between the amount MedFin paid for the provider's asset and the total billed amounts, which was 60 percent of the original bill in Sutter's case. *Howell* cited *Katiuzhinsky* with approval, and distinguished it on the basis that the payment made by MedFin did not relieve the plaintiff of the obligation to pay the entire amount billed. (*Howell*, *supra*, 52 Cal.4th at

---

[10] The court in *Bermudez* observed that while evidence of the billed amounts is relevant, that evidence is generally insufficient by itself to establish reasonable value. (*Bermudez*, *supra*, 237 Cal.App.4th at pp. 1335-1336.) Because of the stipulation, there is no dispute here about whether the billed amounts reflect the reasonable value of the medical treatment plaintiff received.

pp. 554, 557, citing *Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1291.) And both *Bermudez* and *Corenbaum* recognized that distinction. (*Bermudez*, *supra*, 237 Cal.App.4th at p. 1334; *Corenbaum*, *supra*, 215 Cal.App.4th at p. 1328, fn. 10.) Defendant asserted at oral argument that this distinction is one without a difference, but there is a difference. In the situation presented here, there is a danger of prejudice if the jury is misled into awarding plaintiff the amount the third party paid to purchase the provider's asset -- the right to collect plaintiff's total debt -- based on the unsubstantiated notion that such payment reflects the reasonable value of the medical services provided plaintiff.

In defendant's view, the situation presented in this case is not distinguishable because the reasonable value of the medical providers' service is "what the physician or the hospital agreed to be paid for it." Reasonable value, defendant asserts, means the market value -- what people pay on the open market for a service. To be sure, the *Bermudez* court observed that our high court in *Howell* endorsed a "market or exchange value" as the proper way to think about the " 'reasonable value' " of medical services. (*Bermudez*, *supra*, 237 Cal.App.4th at p. 1330.) But defendant overlooks the fact that the providers here did not sell medical services to MedFin nor did MedFin pay for medical services on behalf of plaintiff. As we have said, the providers sold, and MedFin bought, an asset. The value of that asset was based on collectability factors, not necessarily the value of the services previously provided to plaintiff. Furthermore, while recognizing that the *Howell* court endorsed a market value definition for reasonable value, the *Bermudez* court also noted that *Howell* "offered no bright-line rule on how to determine 'reasonable value' when uninsured plaintiffs have incurred (but not paid) medical bills." (*Ibid.*) The *Bermudez* court observed, "[i]n practical terms, the measure of damages in insured plaintiff cases will likely be the amount paid to settle the claim in full," but "the measure of damages for uninsured plaintiffs who have not paid their medical bills will usually turn on a *wide-ranging inquiry into the reasonable value* of medical services

18

provided, because uninsured plaintiffs will typically incur standard, nondiscounted charges that will be challenged as unreasonable by defendants." (*Id*. at pp. 1330-1331, italics added.) As we see it, the inquiry into reasonable value for the medical services provided to an uninsured plaintiff is not necessarily limited to the billed amounts where a defendant seeks to introduce evidence that a lesser payment has been made to the provider by a factor such as MedFin. In such cases, the inquiry requires some additional evidence showing a nexus between the amount paid by the factor and the reasonable value of the medical services. As the trial court observed, such evidence was not offered here.

Thus, the trial court did not abuse its discretion when it excluded evidence of the MedFin payments.

## DISPOSITION

The judgment is affirmed. Defendant shall pay plaintiff's costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(1) & (5).)


   /s/ Murray, J.


We concur:


 /s/ Blease, Acting P. J.


 /s/ Duarte, J.


19