Filed 10/21/16

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| LILLIE MOORE, | C073064 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201000081045CUPAGDS) |
| v. | |
| RICHARD MERCER, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Sacramento County, David De Alba, Judge. Affirmed in part and reversed in part.

Grant, Genovese & Baratta and Lance D. Orloff for Defendant and Appellant.

Greines, Martin, Stein & Richland, Robert A. Olson; and Don Willenburg for Association of Southern California Defense Counsel and Association of Defense Counsel of Northern California and Nevada as Amici Curiae on behalf of Defendant and Appellant.

Leslie M. Mitchell; Piering Law Firm and Robert A. Piering for Plaintiff and Respondent.

Jay-Allen Eisen Law Corporation and Jay-Allen Eisen for MedFinManager as Amicus Curiae on behalf of Plaintiff and Respondent.

To resolve this defense appeal, we descend down a rabbit hole into the upside-down world of health care billing, where different payers pay different prices for the same services and those least equipped to pay, pay the most; yet an injured, uninsured plaintiff, Lillie Moore, must somehow prove the reasonable value of the medical services she incurred following a motor vehicle collision. Defendant Richard Mercer, who admits liability, misinterprets *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*), asks us to expand its logic far beyond the facts and rationale presented, and insists we must overrule our holding in *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288 (*Katiuzhinsky*) that the full amount of a provider's bill can be relevant to prove the reasonable value of the services. We disagree with defendant and amici curiae Association of Southern California Defense Counsel and Association of Defense Counsel of Northern California and Nevada that this case compels such an unprecedented expansion of *Howell*, a rebuke of *Katiuzhinsky*, and the pronouncement of a new rule that the total amount a medical finance company pays for a plaintiff's account receivable and medical lien caps the plaintiff's damages and must be admitted as evidence of reasonable value.

Based on the record before us and the arguments advanced at trial, we conclude (1) *Howell* does not cap a plaintiff's damages to the amount a medical finance company pays health care providers for their accounts receivable and medical liens, and the reasoning of *Katiuzhinsky* remains sound; (2) *Howell* does not limit the trial court's discretion pursuant to Evidence Code section 352 to exclude evidence of the amount a medical finance company pays if the court decides, as it did here, that the evidence was minimally probative, if at all, and would necessitate an undue consumption of time to try collateral issues; (3) the terms of the agreement between a medical finance company and the plaintiff's providers may be relevant and discoverable, and therefore the sanctions imposed on the defendant must be reversed; and (4) the trial court properly entered a

directed verdict on causation. The sanctions order is reversed, and in all other respects, the judgment is affirmed.

## FACTUAL BACKGROUND

### *Paying for Medical Services in the World of Chargemasters, Negotiated Rate Differentials, and Medical Finance Companies for the Uninsured*

In order to appreciate the onerous burden a personal injury plaintiff faces in proving damages for past medical expenses, we must first understand the various methods by which medical providers bill for their services, negotiate discounts for certain groups of payers and not for others, and sporadically sell their receivables and liens to medical finance companies. A brief glossary is helpful. "A hospital charge description master, or chargemaster, is 'a uniform schedule of charges represented by the hospital as its gross billed charge for a given service or item, regardless of payer type.' (Health & Saf. Code, § 1339.51, subd.(b)(1).) California hospitals are required to make their chargemasters public and to file them with the Office of Statewide Health Planning and Development. [Citations.]" (*Howell*, *supra*, 52 Cal.4th at p. 561, fn. 7.) The negotiated rate differential "[i]s the difference between the providers' full billings and the amounts they have agreed to accept from a patient's insurer as full payment." (*Id.* at p. 555.) A medical finance company "purchases medical bills, and the liens securing them, from health care providers." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1291.)

Hospital chargemasters throughout the state vary considerably and are extremely complex. (*Howell*, *supra*, 52 Cal.4th at p. 560.) The Supreme Court noted the extreme disparities in its *Howell* opinion: "The rise of managed care organizations, which typically restrict payments for services to their members, has reportedly led to increases in the prices charged to uninsured patients, who do not benefit from providers' contracts with the plans [negotiated rate differentials]. As one article explains: 'Before managed care, hospitals billed insured and uninsured patients similarly. In 1960, "there were no discounts; everyone paid the same rates"—usually cost plus ten percent. But as some

3

insurers demanded deep discounting, hospitals vigorously shifted costs to patients with less clout.' [Citation.] As a consequence, 'only uninsured, self-paying U.S. patients have been billed the full charges listed in hospitals' inflated chargemasters . . . ,' so that a family might find itself 'paying off over many years a hospital bill of, say, $30,000 for a procedure that Medicaid would have reimbursed at only $6,000 and commercial insurers somewhere in between.' [Citation.] Some physicians, too, have reportedly shifted costs to the uninsured, resulting in significant disparities between charges to uninsured patients and those with private insurance or public medical benefits." (*Howell*, at pp. 560-561, fn. omitted.)

While recognizing that some patients were expected to pay chargemaster rates while others did not, the Supreme Court declared: "We do not suggest hospital bills always exceed the reasonable value of the services provided. Chargemaster prices for a given service can vary tremendously, sometimes by a factor of five or more, from hospital to hospital in California. [Citation.] With so much variation, making any broad generalization about the relationship between the value or cost of medical services and the amounts providers bill for them—other than that the relationship is not always a close one—would be perilous." (*Howell*, *supra*, 52 Cal.4th at pp. 561-562, fn. omitted.)

Since the uninsured have no one to negotiate on their behalf to obtain a rate differential and, in the absence of qualifying for a governmentally subsidized program, have no means to access medical care, medical finance companies have emerged to buy the liens providers obtained against personal injury judgments as a viable means of financing an uninsured's medical expenses. MedFinManager California, L.L.C. (MedFin), the medical finance company that bought plaintiff's liens in this case, was the central figure in *Katiuzhinsky*, from which we extract the following description of the typical contractual relationship between MedFin and the medical providers.

"MedFin is a financial service company that purchases medical bills, and the liens securing them, from health care providers. It is not an insurance company. MedFin

4

works with plaintiff personal injury law firms and with doctors and hospitals. Typically, MedFin becomes involved in a situation where a plaintiff sustains injuries in a traffic accident and needs medical treatment, but has no health insurance.

"Prior to treatment, the medical provider asks MedFin to evaluate the case to determine whether it is willing to purchase the medical account after the rendition of services. MedFin will then contact the plaintiff's attorney and gather information about the case to ascertain whether the plaintiff's claim against the tortfeasor is worth its investment.

"If the claim meets with MedFin's approval, it notifies the medical provider that it is willing to purchase the account and the lien rights. MedFin and the medical provider have their own agreement that governs their rights and obligations. The contract usually stipulates that MedFin will purchase the bill for about 50 cents on the dollar. Before the plaintiff receives services, the plaintiff and his attorney execute a consensual lien in favor of the medical provider. After services are rendered, the medical provider notifies the parties to the lawsuit of its medical lien. (Civ. Code, §§ 3045.1–3045.6.)

"MedFin does not negotiate with the plaintiff or the medical provider how much the provider charges for medical services. These sums are based on a standard fee schedule registered with the state, and are the same as any patient would incur in the ordinary course of business.

"MedFin's agreement with the medical provider does not require the provider to sell its bill to MedFin. After the rendition of medical services, the provider decides whether or not to sell its account to MedFin. In some cases, a medical provider will retain the account for itself, in which case it can enforce its lien and collect the full amount due from the plaintiff.

"If the medical provider does sell its account to MedFin, it executes a formal 'Notice of Sale and Assignment,' which is sent to the plaintiff. Having sold the bill and lien, the provider closes its book on the account. At that point, MedFin owns the account

5

and assumes the entire expense and risk of collection. The plaintiff remains liable for the bill and owes MedFin the full amount of what has been charged. Once the plaintiff's case is resolved, MedFin typically gets paid quickly, since the plaintiff's attorney will ordinarily pay the lien from the recovery." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at pp. 1291-1292.)

***The Collision***

Defendant Mercer admits that he negligently collided with plaintiff's car. The impact had major consequences for her health and lifestyle. Plaintiff describes feeling "a major impact" when defendant's car struck plaintiff's car on the front driver's side. She was thrown back into her seat "and then just jerked." The car in which she was riding was "kind of spun around" about 45 degrees. She testified she had no physical limitations before the accident. An employee who worked for her at the time of the collision described plaintiff as the "queen bee." She told the jury, "Everything I learned about serving was from Lillie, and she was always in five places at once it seemed like, with also what seemed like six plates on each arm and running around and takin' orders, just doin' everything there was to do." A good friend testified that before the collision plaintiff was "very, very full of life." According to this witness, plaintiff was "[a]lways a lot of fun, full of energy, um, kind of really the social butterfly of the group." She was also uninsured.

***Medical Treatment***

Following the collision, however, plaintiff's life changed dramatically. She could no longer roughhouse with her little boy, she could not work full time or run, she minimized her activities, and she suffered chronic pain. But there was no evidence of malingering. To the contrary, although plaintiff experienced pain shortly after the collision, she tried to work that same night at the restaurant she, her husband, and a friend co-owned. But unable to do the work, she was forced to leave early. She sought medical treatment two days later from Dr. Mark Diaz, a family practice and occupational

6

medicine specialist. Dr. Diaz initially advised a conservative course of treatment, including medication for pain. Plaintiff also obtained chiropractic treatment she believed was helpful, but her working capacity was "greatly reduced." Dr. Diaz referred her to an orthopedic surgeon, Dr. Philip Orisek.

Plaintiff appears to have tried everything she could to avoid back surgery. She went to physical therapy and religiously did all the exercises her therapist recommended at home. She tried aquatic therapy. She lost 25 pounds. She moved to the coast, where she has additional family support. She started a new job that provided flexibility on the number of hours she worked. Despite all her efforts, the debilitating pain continued. Yet she was terrified of surgery.

Dr. Orisek believed that plaintiff, who at the time was in her late 20's and, prior to the collision, did not have chronic problems with her back, was an excellent candidate for disk replacement surgery. But he acknowledged that as far as back surgeries go, disk replacement is "one of the hardest operations," with a risk of catastrophic complications. He left it to his patients to determine if, and when, the pain became so intolerable it was worth the risks attendant to the surgery. In February of 2012 plaintiff reached that point. Unable to engage with her son as she had before the collision, to work full time, or to participate in all the activities she enjoyed, she agreed to disk replacement surgery.

Dr. Michael Ridgeway, a trauma surgeon, assisted Dr. Orisek. He described the surgery as "a big procedure because we're getting to the spine which is in the back from the front." He explained to the jury the intricacies of his role in assisting in such a high-risk operation. After making a low midline incision, he pulled the erectus muscles apart, went under the intestines and pulled them out of the way, then safely moved the iliac artery and vein that runs over the area where the disk was removed as well as the ureter, and held everything in place to minimize the risk that Dr. Orisek would injure anything as he replaced the injured disk with an artificial disk. Dr. Ridgeway emphasized that the primary risk is catastrophic bleeding. If the vessels in the pelvis are injured, a patient can

7

bleed to death in about one minute. Outside of two surgeons in the Kaiser system, there are only five or six surgeons in the Sacramento region who regularly perform these procedures.

Dr. Orisek was equally emphatic about how difficult disk replacement surgery is. Once Dr. Ridgeway showed him plaintiff's injured disk, he had to clean out the disk and remove the herniated piece, which is way in the back, just in front of the nerves. If he were to go too far and allow spinal fluid to spill out, the damage would be disastrous and the only thing that could be done would be to apply a sealant and instruct the patient to lie in bed flat for three or four days, hoping it would heal. Thus, there is "absolutely zero room for error."

Once Dr. Orisek removed the damaged disk, he was left with a "giant empty space." He described the most difficult aspect of the surgery—placing the artificial disk right in the middle position. "[W]ith very high precision," he used a big five-pound hammer to pound the disk into place. He informed the jury that around the country many patients suffered "catastrophic vascular injuries because you're putting such a big implant into such a tight space." He successfully implanted the device right against the back of the bone and "dead in the center."

*Discovery*

Before the uninsured plaintiff was able to secure medical treatment, including her surgery, she executed medical lien agreements with her health care providers, obligating her to pay the full amount of the fees billed. Her providers subsequently sold their bills and liens to MedFin, the medical finance company described in *Katiuzhinsky*, *supra*, 152 Cal.App.4th at pp. 1291-1292.

During discovery, defendant filed a motion to compel Dr. Orisek, a nonparty to the litigation, to produce billing records, payment records, and records evidencing any agreements for the medical care of plaintiff related to her surgery on February 2, 2012. Citing privacy and confidentiality, Dr. Orisek refused to produce his agreement with

8

MedFin. Plaintiff's lawyer made repeated efforts to meet and confer with defense counsel and produced all the documents sought by defendant except the written agreement between Dr. Orisek and MedFin regarding the sale of bills and liens. The documents produced by Dr. Orisek included both the lien agreement between Dr. Orisek and plaintiff, and the notification from Dr. Orisek to plaintiff that her lien had been sold to MedFin and that she was obligated to pay the full amount to MedFin. Defense counsel did not respond to the meet-and-confer efforts by plaintiff's counsel.

The trial court denied the motion and awarded plaintiff $2,500 in sanctions. Expressly aware that the right to discovery is broader than the admissibility of evidence at trial, the court nevertheless concluded that whatever information existed between MedFin and Dr. Orisek would never be admitted in light of the Supreme Court's holding in *Howell*, *supra*, 52 Cal.4th 541. "The court does not see the relevance as to what was paid for the assignment of the lien rights, as the issues that would go into whatever MedFin paid would have nothing to do with the reasonableness of the medical bill. What would -- what MedFin pays more likely would be an evaluation of liability issues. It could be, from the doctor's perspective, cash flow, or issues that have absolutely nothing to do with the plaintiff's burden of establishing that whatever is put before the jury is supported by testimony that the charge is reasonable." Later, the court reiterated, "I can't imagine a more irrelevant discussion than trying to get before a jury . . . Dr. Orisek's cash flow or MedFin's assessment of liability on the question of reasonableness or any other factors as between the doctor and the finance company as to why they agreed on whatever number they did . . . ."

### Motion in Limine

At trial, plaintiff moved in limine to exclude evidence "that plaintiff's medical services were paid for, purchased by, discounted to, or assigned to MedFin" as irrelevant and prejudicial under Evidence Code section 352. The trial court granted the motion, finding that evidence about the amounts paid by MedFin would require litigation of

9

numerous intrusive collateral issues about the providers' financial management reasons for selling their bills and liens at a particular price, which were not relevant to the value of the services.

***Evidence of Past Medical Expenses Introduced at Trial***

There is a huge chasm between the evidence and theories introduced at trial and the arguments raised on appeal, particularly by amici curiae Association of Southern California Defense Counsel and the Association of Defense Counsel of Northern California and Nevada.  Because " 'California courts refuse to consider arguments raised by amicus curiae when those arguments are not presented in the trial court, and are not urged by the parties on appeal,' " they " ' " 'must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered.' " ' " (*Berg v. Traylor* (2007) 148 Cal.App.4th 809, 823, fn. 5.)  Thus, we must carefully scrutinize what evidence was offered, what evidence was challenged on what grounds, and what evidence was admitted.

Plaintiff offered into evidence two summaries of the medical bills she incurred as a result of the injuries she sustained in the collision.  Defendant made no objection to exhibit No. 8.  He made a foundational objection to exhibit No. 26, which the judge overruled because the exhibit was merely being shown to a witness and was not then being introduced into evidence.  When it was ultimately offered into evidence, defendant did not object.

The summaries set forth the following charges:

| | |
|---|---|
| Mark Diaz, M.D. | $ 1,100.00 |
| Anthony Rayman, M.D. | 4,000.00 |
| Discovery Diagnostics | 7,160.00 |
| Capitol Physical Therapy | 2,187.00 |
| Phillip Orisek, M.D. | 40,853.50 |
| Michael Ridgeway, M.D. | 15,528.45 |

| | |
|---|---|
| San Luis Physical Therapy | 1,860.00 |
| Radiological Associates | 3,153.00 |
| Active Diagnostics | 2,547.00 |
| Central Anesthesia Service | 2,070.00 |
| Diagnostic Pathology | 130.71 |
| Sutter Memorial Hospital | 104,804.57 |
| Community Health Centers | 628.51 |
| Timberlake | 119.26 |
| Hot Cold Unit | 2,600.00 |
| <u>Body + Balance Physical Therapy</u> | <u>2,490.00</u> |
| Total | $191,232.00 |

Plaintiff testified that she incurred these medical expenses. She did not offer into evidence the underlying bills. Defendant solicited the expert opinion of a nurse as to the value of the services plaintiff received. On appeal, defendant and amici curiae insist that the amount the providers were paid by MedFin represents the market value of the services and is the exclusive measure of plaintiff's economic loss. We address their argument in the body of the opinion, *post*.

Drs. Orisek, Ridgeway, and Diaz all testified the amounts they billed reflected their ordinary and customary charges and the reasonable value of their services. A representative of Sutter Memorial Hospital testified that the amount billed by Sutter reflected the hospital's ordinary and customary charges. Dr. Orisek also testified that based on his experience in performing hundreds of surgeries, Sutter's bill for $104,804.57 was reasonable and within the range of the amount ordinarily charged by hospitals for such surgeries. And Dr. Diaz testified that in his experience, plaintiff's bills reflected the reasonable value of the medical services she received.

Vicki Schwitzer, a registered nurse, was hired by the defense as a billing expert. She testified, "A billing expert is someone who has expertise in medical bills. Medical

11

bills are made up of CPT [current procedural terminology] codes and charges associated with medical treatment, and that's my area of expertise." She explained her methodology to the jury. She first obtains all the medical records to determine if they support the charges. If the CPT codes are missing, she assigns them. She makes sure that the providers use the appropriate codes for combined services and adjusts them when they do not. Next, she looks at the reasonable value for each code in that specific geographic area, and if the charges are over the 80th percentile, she reduces the bill. The company she works for, Exam Works, set the reasonable threshold at the 80th percentile, meaning that 8 out of 10 doctors, or 80 out of a 100, or 800 out of 1,000, would bill that amount or less. She relies on databases, which amalgamate the information from millions of bills on an annual basis.

The record suggests that Schwitzer reviewed the bills of seven of plaintiff's providers. As to three of the providers, Mark Diaz, M.D.; Rayman, D.C., Keystone Chiropractic; and Capitol Physical Therapy, she made no reductions. She substantially reduced, however, the hospital, plaintiff's surgeons, and the diagnostics bills. Thus, she testified that the reasonable value of the hospital services was only $41,438.35, when Sutter had billed $104,804.57; the reasonable value of the orthopedic surgeon was only $12,500.35, when Dr. Orisek had billed $40,853.50; the reasonable value of the assistant trauma surgeon was only $6,483.02, when Dr. Ridgeway had billed $15,528.45; and the reasonable value of the diagnostic procedures, including the MRI's ordered by plaintiff's physicians, was only $3,675.00, when Discovery Diagnostics had billed $6,550.00. Whereas the total amount charged by these seven providers was $175,223.52, the nurse opined that the reasonable value of the services was $71,106.12.

### Directed Verdict

The trial court granted plaintiff's motion to enter a directed verdict as to one question on the special verdict form, which reads, "Was the negligence of Defendant Richard Mercer a substantial factor in causing harm to Lilly Moore?" In an earlier

12

response to plaintiff's request for admission, defendant admitted he was a substantial factor in causing the incident. Plaintiff argued she was entitled to the directed verdict on causation because all of the parties' experts opined that the collision caused the injuries plaintiff sustained.

### Jury Verdict

The jury awarded plaintiff a total of $522,689 in damages. The total damages award includes $122,689 for past medical expenses; $45,000 for future medical expenses; $180,000 for physical pain, physical impairment, loss of enjoyment of life, inconvenience, anxiety, and emotional distress; and $175,000 for future noneconomic loss. Defendant challenges only the amount the jury awarded for past medical services. Thus the difference between what the defense expert opined is the reasonable value of the services ($71,106.12) and what the jury awarded ($122,689) is $51,582.88. Defendant appeals.

## I

### Evidentiary Issues Involving Plaintiff's Past Medical Expenses

#### A. *Is the Amount that a Plaintiff's Health Care Providers Accept as Payment the Only Evidence Relevant to Prove Economic Damages for Medical Expenses?*

Relying on *Howell*, *supra*, 52 Cal.4th 541, defendant makes the radical assertion that the "amount that Moore's healthcare providers accepted in full payment for their services is the only evidence that is relevant to prove Moore's economic damages for medical expenses." The difficulty of the procedure, or surgery; the expertise of the surgeons; the number of surgeons competent to perform an intricate, high-risk surgery; and the multitude of other factors that would ordinarily help a jury assess reasonable value would, under defendant's restrictive view of admissibility, be deemed irrelevant. To accept defendant's application of *Howell* would require us to disavow the contrary rationale we adopted in *Katiuzhinsky*, *supra*, 152 Cal.App.4th 1288. But plaintiff insists our holding in *Katiuzhinsky* is consistent with *Howell* and its predecessor, *Hanif v.*

13

*Housing Authority* (1988) 200 Cal.App.3d 635 (*Hanif*), which is also from our appellate district.

We disagree. Nothing in *Howell* suggests a need to revisit the issues we addressed in *Katiuzhinsky*, let alone compels us to do so. And neither case addresses the pivotal issue before us—whether a trial court retains discretion under Evidence Code section 352 to exclude evidence of an injured plaintiff's medical liens and the sale of the liens to a medical finance company where the evidence is minimally probative and would require the undue consumption of time on a host of collateral matters.

Plaintiff has a two-step burden of proof in establishing damages for past medical services. The measure of recovery is well established: "[A] person injured by another's tortious conduct is entitled to recover the reasonable value of medical care and services reasonably required and attributable to the tort." (*Hanif*, *supra*, 200 Cal.App.3d at p. 640.) First, plaintiff must prove that she *actually* incurred the medical expenses and the amount of her liability for the expenses caps her potential recovery. *Hanif*, followed by *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298 (*Nishihama*) and *Howell*, as we explain, *post*, resolved this rather straightforward issue. Second, plaintiff must prove the reasonable value of the medical services but is entitled to no more than the expenses she actually incurred. "[A] plaintiff may recover as economic damages *no more* than the reasonable value of the medical services received and is not entitled to recover the reasonable value if his or her actual loss was less." (*Howell*, *supra*, 52 Cal.4th at p. 555.) In *Katiuzhinsky*, we resolved one aspect of the thornier issue posed by attempting to prove the reasonable value of the medical services. Here we must further examine the relevancy of evidence of reasonable value and the scope of the trial court's discretion to exclude evidence of the sale of a plaintiff's medical liens.

Before 1988 a plaintiff, relying on the collateral source rule, could recover the full amount of a health provider's charges despite the fact that an insurer or governmental agency had prenegotiated a discounted rate for the services and the plaintiff was not

14

liable for the full amount. (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6.) The collateral source rule states that "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Id*. at p. 6.)

In *Hanif*, *supra*, 200 Cal.App.3d 635, however, we rejected the application of the collateral source rule in this context. We returned to the fundamental policy underlying tort compensation, that damages are designed to compensate a plaintiff for the injury suffered and to restore her as nearly as possible to her former position. (*Id*. at pp. 640-641.) An award of damages "in excess of what the medical care and services actually cost constitutes overcompensation." (*Id*. at p. 641.) We concluded, "Thus, when the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care despite the fact it may have been less than the prevailing market rate." (*Ibid*.) The collateral source rule, we observed, simply was not at issue. (*Ibid*.) We agree with plaintiff that the focus of *Hanif* is on the cost to the plaintiff, not the payment to the health care provider, because that cost represents the economic loss a tort recovery is designed to reimburse.

*Hanif* involved prenegotiated Medi-Cal rates. In 2001 the First District Court of Appeal applied the *Hanif* rationale to discounts negotiated by a private insurer with health care providers before the medical services are delivered. (*Nishihama*, *supra*, 93 Cal.App.4th at p. 306.) Although the plaintiff was charged $17,168 for the care she received at a hospital, the hospital had accepted the prenegotiated rate of $3,600 as payment in full for the services it rendered to the plaintiff. (*Id*. at pp. 306-307.) The court found "that the trial court erred in permitting the jury to award plaintiff $17,168 instead of $3,600" for the hospital charges. (*Id*. at p. 309.)

15

Nearly 20 years after *Hanif* we were confronted with an entirely different set of facts in *Katiuzhinsky*. Unlike the plaintiffs in *Hanif* and *Nishihama*, the plaintiffs in *Katiuzhinsky* were uninsured. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at pp. 1291-1292.) No insurer or governmental agency, therefore, had prenegotiated any discounts with health care providers on their behalf. They, like the plaintiff before us, suffered injuries in an automobile accident. (*Id*. at p. 1291.) In need of medical care but uninsured, they employed the same creative financing arrangement plaintiff did. (*Id*. at pp. 1291-1293.) In both cases the plaintiffs, injured and uninsured, turned to MedFin. (*Ibid*.)

Relying on *Hanif* and *Nishihama*, the defendants in *Katiuzhinsky* brought a motion in limine to preclude the introduction of any evidence of medical expenses incurred above the amounts that MedFin paid the plaintiffs' health care providers to purchase their bills. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1291.) The trial court granted the motion despite the fact that the plaintiffs remained liable for payment of the full amount of the providers' charges. (*Id*. at p. 1293.) The trial court ruled that the only admissible evidence of the plaintiffs' damages for medical expenses was the amounts MedFin paid the medical providers to acquire their liens. (*Ibid*.)

We rejected the court's rationale and reversed the trial court ruling excluding evidence and limiting recovery. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at pp. 1295-1296.) We emphasized that even if the defendants had been entitled to a reduction in damages, evidence of the full amount of the charges was admissible. "Thus, regardless of whether defendants were entitled to a *Nishihama*-type *reduction* of the medical damage award, there was no basis in law to prevent the jurors from receiving evidence of the amounts billed, as they reflected on the nature and extent of plaintiffs' injuries and were therefore relevant to their assessment of an overall general damage award." (*Katiuzhinsky*, at p. 1296.)

We also rejected the notion that *Hanif*, *Nishihama*, and *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595 limited the plaintiffs' recovery to the amount a third

16

party paid for the receivables and the liens. We distinguished those cases based on a crucial difference. "[U]nlike the circumstances in *Hanif*, *Nishihama* and *Parnell*, plaintiffs here remain fully liable for the amount of the medical provider's charges for care and treatment." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1296.) We explained: "The principle of law for which *Hanif* . . . stand[s] is that a plaintiff's recovery should be limited to 'the actual amount he paid *or for which he incurred liability* for past medical care and services.' [Citations.] The point is crucial, for those decisions rest on the principle that a damage award should not place a tort plaintiff in a ' "better position" ' than if the wrong had not been done. [Citation.] Under the trial court's ruling, plaintiffs are placed in a *worse* position than had the tort not been committed. Despite the fact that plaintiffs are liable for the full amount of the medical bills, the tortfeasor is answerable only for a discounted rate paid by a bill collector that bought the lien from a health care provider. The result is that plaintiffs are *undercompensated* and the tortfeasor receives a windfall." (*Ibid*.)

Moreover, we observed, "[a] subsequent assignment of the bill to a third party cannot result in a *decrease* in the value of services that have already been rendered." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1297.) But that was the result of the trial court's ruling limiting the plaintiffs' recovery to the amount MedFin paid for the lien. We concluded: "Plaintiffs should have been permitted to present evidence of the amounts charged to and incurred by them, and to argue to the jury that these amounts represented the reasonable value of the medical services provided." (*Id*. at p. 1298.)

Yet defendant and amici curiae urge us to rebuke *Katiuzhinsky* and once again to limit a plaintiff's recovery for past medical services to the amount MedFin paid the providers. They insist that *Howell* and two cases from the Second Appellate District, *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*) and *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120 (*Ochoa*) compel us to overrule our *Katiuzhinsky* holding. Not so.

17

*Howell* simply puts the Supreme Court imprimatur on the *Hanif/Nishihama* rule that a plaintiff who is not liable to health care providers for any amount above a prenegotiated rate does not suffer an economic loss when a tortfeasor's liability is commensurate with the plaintiff's. The Supreme Court put it this way: "[I]f the plaintiff negotiates a discount and thereby receives services for less than might reasonably be charged, the plaintiff has not suffered a pecuniary loss or other detriment in the greater amount and therefore cannot recover damages for that amount. [Citations.] The same rule applies when a collateral source, such as the plaintiff's health insurer, has obtained a discount for its payments on the plaintiff's behalf." (*Howell*, *supra*, 52 Cal.4th at p. 555.)

To be sure, the health care providers in *Howell* accepted the discounted amounts as full payment pursuant to a preexisting agreement with the plaintiff's managed care plan. The plaintiff's prospective liability therefore was limited to the amount the managed care plan had agreed to pay the providers for the services they were to render. The Supreme Court expressly recognized that in this way, the determinative fact was analogous to *Hanif* and not *Katiuzhinsky*. The court left no mystery. It specifically excluded the *Katiuzhinsky* third-party-purchase scenario from its holding. The court explained: "In this respect, plaintiff here was in the same position as the *Hanif* plaintiff, who also bore no personal liability for the providers' charges. This is not a case like *Katiuzhinsky v. Perry*, *supra*, 152 Cal.App.4th at page 1296, where the plaintiffs 'remain[ed] fully liable for the amount of the medical provider's charges for care and treatment.' " (*Howell*, *supra*, 52 Cal.4th at p. 557.) The Supreme Court in *Howell* noted the holding in *Katiuzhinsky* that " '[t]he intervention of a third party in purchasing a medical lien does not prevent a plaintiff from recovering the amounts billed by the medical provider for care and treatment, *as long as the plaintiff legitimately incurs those expenses and remains liable for their payment.*' [Citation.]" (*Howell*, at p. 554.) And the court distinguished a third-party purchase of a medical lien from prenegotiated payments by insurers. (*Ibid*.)

18

Despite the Supreme Court's express disavowal that the crucial facts in *Hanif* were analogous to *Katiuzhinsky*, defendant and amici curiae argue, based on *Howell,* there is no distinction between typical insurers and a medical finance company. In their view, an injured plaintiff is entitled to no more than the amount the medical finance company paid for her lien despite the fact she remained liable for the full amount of the bills. That is a plain misreading of *Howell*, a case dealing only with a negotiated rate differential and no medical finance company. Defendant's position finds support in two decisions from the same division of the Second District Court of Appeal. *Corenbaum*, *supra*, 215 Cal.App.4th 1308 is easily distinguished. Defendant extracts favorable language from the opinion divorced from the factual context in which the court stated: "Because an injured plaintiff can recover as damages for past medical expenses no more than the amount incurred for those past medical services (*Howell*, *supra*, 52 Cal.4th at p. 555), evidence that the reasonable value of such services exceeded the amount paid is irrelevant and inadmissible on the issue of the amount of damages for past medical service (see *id*. at p. 559)." (*Corenbaum*, *supra*, 215 Cal.App.4th at p. 1329.) But *Corenbaum*, like *Howell*, involved a rate differential prenegotiated by the health insurer. Since *Howell* itself distinguished the factual scenario where a plaintiff bears no potential liability from one where she remains liable for the full amount of the charges, *Corenbaum* merely applies *Howell* to the analogous facts before it.

Defendant correctly points out that the second case, *Ochoa*, disagrees with the holding in *Katiuzhinsky* that the full amount of the plaintiff's bills for past medical services is relevant to prove the reasonable value of the services. The court in *Ochoa* insists that the rationale of *Howell* compels this conclusion. We need not delve into why *Ochoa*'s reasoning is faulty because defendant in the case before us did not object to the admission of the full amount of the bills at trial and therefore did not preserve the issue for review on appeal. The issue before the trial court was the relevancy of the business transactions between MedFin and plaintiff's medical provider, not, as in *Ochoa*, whether

19

the full amount of the bills was relevant to prove reasonable value. Thus, we reject defendant and amici curiae's opportunistic attempt to use this case as a vehicle to overturn principles of law that were not tried below.

*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311 (*Bermudez*), on the other hand supports our analysis. *Bermudez* also identified the critical distinction between *Howell* and *Katiuzhinsky*; *Howell* involved an insured plaintiff, *Katiuzhinsky* was uninsured and liable for the amount of the medical services received. (*Bermudez*, at pp. 1329-1330.) "*Howell* did not disapprove of *Katiuzhinsky*; it explicitly distinguished the facts before it from *Katiuzhinsky*, noting *Howell* was 'not a case . . . where the plaintiffs "remain[ed] fully liable for the amount of the medical provider's charges for care and treatment." ' (*Howell, supra*, 52 Cal.4th at p. 557.)"(*Bermudez*, at p. 1330.)

**B.    *Did the Trial Court Have the Discretion to Exclude Evidence of the Agreements and Payments between Plaintiff's Health Care Providers and MedFin?***

The trial court granted plaintiff's motions in limine to exclude all evidence of any agreements between MedFin and her health care providers as well as the amount MedFin paid the providers for the liens. Neither *Howell* nor *Katiuzhinsky* resolves the propriety of the trial court's evidentiary ruling. Defendant argues the evidence is relevant to establish the reasonable value of the medical services rendered. Plaintiff argues the trial court retained the discretion to exclude the evidence under Evidence Code section 352 because the admission of the evidence would necessitate the trial of innumerable collateral issues. They are both right.

The trial court acknowledged the evidence might be probative but granted plaintiff's motion because the admission of the evidence would require litigating a vast number of collateral issues. But in an industry in which different payers pay vastly different fees for the same services and businesses have been created to finance the uninsureds' medical care and potentially to reap large profits to compensate for the risk they underwrite, collateral issues may be unavoidable in calculating reasonable value.

20

Thus in *Howell*, where the medical provider, by agreement, accepted a negotiated rate less than the provider's full bill, the Supreme Court concluded evidence of that amount is relevant and admissible to prove past medical expenses.

*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260 (*Children's Hospital*) provides some guidance. There the dispute was over the reasonable value of the hospital's services to Medi-Cal beneficiaries during a 10-month period when Blue Cross did not have a written agreement with the hospital. (*Id*. at p. 1264.) Because the trial court misconstrued a relevant statute, the evidence of the reasonable and customary value of the medical services was limited to the hospital's fully billed charges. The Court of Appeal analogized to quantum meruit cases where the measure of recovery is comparable to a plaintiff's recovery for past medical services. The court explained: "In determining value in quantum meruit cases, courts accept a wide variety of evidence. For example, the party suing for compensation may testify as to the value of his services or offer expert testimony. However, such evidence is not required and is not binding on the trier of fact. [Citation.] Evidence of value can also be shown through agreements to pay and accept a particular price. [Citations.] 'The court may consider the price agreed upon by the parties "as a criterion in ascertaining the reasonable value of services performed." ' [Citation.] Accordingly, in an action for the reasonable value of services, a written contract providing for an agreed price is admissible in evidence. [Citation.] Additionally, evidence of a professional's customary charges and earnings is relevant and admissible to demonstrate the value of the services rendered." (*Id*. at pp. 1274-1275.)

The court recognized that evidence which might be admissible in one case might not be admissible in another. "[T]he facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at issue, i.e., the price that would be agreed upon by a willing buyer and a willing seller

21

negotiating at arm's length. Specific criteria might or might not be appropriate for a given set of facts." (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1275.)

We agree with the trial court that introduction of evidence of what a third party was willing to pay for an account receivable or lien depends on a wide variety of factors bearing no relevance to the reasonable value of the services when rendered, such as the probability of achieving a sizable jury verdict, the skill of the lawyers, and the strength of the evidence. In short, the amount may reflect the medical finance company's tolerance for risk with absolutely no reflection on the value of the services the plaintiff received. Similarly, the introduction of evidence of the amount the provider was willing to accept is equally divorced from the reasonable value of the services delivered and may be related to financial pressures on the provider or managing the cash flow of the operation. The calculation by both sides therefore relates more to their business-related cost/benefit assessment than to a determination of the reasonable value of the services when rendered. The probative value of such evidence in determining the reasonable value of the medical services provided an injured plaintiff is minimal.

Nevertheless, we cannot say the evidence is irrelevant as a matter of law. The agreement between MedFin and Dr. Orisek could reveal what the doctor believed was the reasonable value of his services, apart from his calculation of the expense and risk of collection. Conceivably, defendant's expert could base an opinion on reasonable value in part on the amount Dr. Orisek accepted from MedFin as full payment for his services. And finally, the agreement may have information or lead to the discovery of admissible evidence as to whether plaintiff remains responsible for 100 percent of the billed amount. But as we learn from *Children's Hospital*, "the facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at issue." (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1275.) As quoted at the outset of our opinion, the Supreme Court in *Howell* described the vast disparities in what various payers pay for identical medical services and stated that trying to draw inferences

22

of reasonable value from what is charged and what is paid "would be perilous." (*Howell*, *supra*, 52 Cal.4th at p. 562.) As a result, it seems particularly appropriate for the trial court to perform its traditional gatekeeper role as to the admissibility of evidence and, pursuant to Evidence Code section 352, to determine whether evidence that is minimally probative should be admitted or whether it will require an undue consumption of time to try the collateral issues that evidence of what a third party paid for an account receivable and lien will necessarily raise.

That is precisely what the trial court did in this case. Although initially the court described the evidence as irrelevant, by the time it ruled on plaintiff's motions in limine it recognized the evidence might be marginally probative but excluded it to avoid the trial of a host of ancillary, and totally collateral, issues. The court explained its concerns as follows: "Well, I don't know what Dr. Orisek would say.

"But if the Court permitted you to ask Dr. Orisek, isn't it true that you accepted a lesser amount, whatever it be, then don't we get into collateral issues about why.

"Could be the doctor was about to file bankruptcy and he needed the money. Could be he's not interested in collections. Could be a lot of reasons. He owed a debt to someone else. I don't know.

"Or that in fact that's the reasonable value. He was willing to accept it.

"Don't know the answers to those questions, but the point is aren't we then getting to a side issue that really has nothing to do with the plaintiff's -- the value per se?

"I understand what you're saying about your expert. If you have an expert that is prepared to stand before the Court and the jury and say, well, the value of the doctors' services or the hospital's services or a particular medical provider is not a hundred thousand dollars, but instead it's 50 or 60, whatever it be. I think you can properly do that.

"But to then reference a lien as further proof of that I fear gets into the collateral issues as to why the plaintiff or the providers I should say were willing to compromise their willingness -- their bills I should say."

We review the trial court's exercise of its discretion to exclude evidence pursuant to Evidence Code section 352 for an abuse of discretion. (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000 (*Uspenskaya*).) We can find nothing in *Howell* to circumscribe the court's exercise of discretion, and on this record, we can find no abuse. We begin with our observation in *Katiuzhinsky* that "[a] subsequent assignment of the bill to a third party cannot result in a *decrease* in the value of services that have already been rendered." (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1297.) Thus, it is wrong to suggest, as defendant and amici curiae do, that the so-called market value of a receivable months or years after the services are rendered determines the reasonable value of the medical service at the time the injured patient was treated. In essence, defendant erroneously equates the value of the bill with the value of the services the health care providers delivered. We agree, therefore, with the trial court that introduction of the evidence of what a medical finance company is willing to pay for a lien against a personal injury jury verdict bears little, if any, relevance to the reasonable value of the services themselves.

But even if, as *Children's Hospital* suggests, the amount the providers accepted as payment is somewhat probative of the value of what they provided, introduction of the evidence opens a Pandora's box of collateral issues plaintiff would have the opportunity to litigate. The trial court's astute observations about a few of the factors that might have informed the parties' assessment of the value of the lien, including, for example, whether the doctor was strapped for cash or MedFin believed the litigators were exceptional, demonstrates a deliberate and wise exercise of discretion. Certainly the trial of those, and many other, collateral issues would consume considerable time and lead to a protracted trial on tangential matters. In sum, the court carefully weighed the minimal probative

24

value against the cost and distraction of trying why a doctor would sell and a medical finance company would buy a substantially discounted account receivable and lien. There was no abuse of discretion.

Similarly, in *Uspenskaya*, we found the trial court had not abused its discretion pursuant to section 352 by excluding evidence of the amount MedFin had paid.  We explained, "The problem in cases involving MedFin, or similar companies purchasing accounts receivable (sometimes referred to as factors), is that MedFin's purchase price represents a reasonable approximation of the *collectability of the debt* rather than a reasonable approximation of the *value of the plaintiff's medical services*.  In other words, the health care providers evaluate the risk of collectability and make a decision to settle for some amount that may or may not reflect the actual value for those services. (*Uspenskaya*, *supra*, 241 Cal.App.4th at p. 1003.)  Using the vernacular appropriate to a section 352 analysis, we concluded the probative value of the evidence was at best limited.  (*Ibid*.)

We also pointed out the danger of prejudice.  We wrote, "There is a substantial danger of prejudice because a jury could rely solely on a third party payment to fashion its award, which might not represent the reasonable value of a plaintiff's treatment and result in a situation where the plaintiff is not made whole, but rather remains liable to the third party for the entire debt, including the difference between the billed amounts and the amounts paid to the providers to purchase the debt." (*Uspenskaya*, *supra*, 241 Cal.App.4th at p. 1004.)

In *Uspenskaya*, we found the court did not abuse its discretion by excluding the evidence of the MedFin payments because there was no "additional evidence showing a nexus between the amount paid by the factor and the reasonable value of the medical services." (*Uspenskaya*, *supra*, 241 Cal.App.4th at p. 1007.)  The trial court had engaged in a quintessential balancing of the probative value against the danger of the prejudice and we upheld the exercise of that discretion.  Here too, the calculus involved the same

25

assessment of probative value—that the collectability of a debt bears little relationship to the value of the services. But more significantly, the trial court here weighed the danger of litigating collateral issues and concluded the evidence should be excluded. *Uspenskaya* supports the result we reach here that the trial court retains the discretion to determine the admissibility of MedFin Payments using a traditional section 352 analysis.

## C.     *Did Plaintiff Sustain Her Burden of Proving That She Incurred Liability for Medical Charges?*

Defendant insists that plaintiff failed to sustain her burden to prove she actually incurred liability for the full amount of the doctor and hospital charges. If there was a failure, it was defendant's failure to challenge plaintiff's evidence at trial. He sardonically refers to plaintiff's "attorney-prepared list[s]" and bemoans her failure to introduce the actual medical bills into evidence. But he raised no objection to the lists at trial, nor did he introduce any evidence to demonstrate inaccuracies in the lists or expose any deficiencies through cross-examination. The lists were an efficient manner of presenting the evidence to the jury and, in the absence of an objection or evidence to the contrary, sustained plaintiff's burden of proving her damages.

Moreover, defendant ignores plaintiff's testimony that she incurred all the charges reflected on the lists. Her testimony alone was sufficient to meet her burden of proof. In addition to primary care physician Dr. Diaz, her surgeons, Drs. Orisek and Ridgeway, and a representative of Sutter all testified that she incurred the amounts billed. And the testimony was corroborated by the lien agreement plaintiff executed in favor of Dr. Orisek and the assignment of his lien rights to MedFin, both of which demonstrate plaintiff is liable to MedFin for the full amount of the bills. Defendant, of course, had the opportunity at trial to cross-examine plaintiff and to introduce evidence to the contrary. But he failed to avail himself of the opportunity at trial and now attempts to construct a case he did not present to the jury. Notwithstanding his derogatory characterizations of

26

plaintiff's evidence, her testimony, the testimony of her providers, and the lists provided ample evidence that she incurred liability for the doctor and hospital bills, whether the bills reflected the reasonable value of the services rendered.

As to whether the bills reflected the reasonable value of the services rendered defendant presented a vigorous defense. Whereas plaintiff claimed over $190,000 for the reasonable value of past medical expenses, defendant's billing expert explained in some detail how she arrived at a reasonable value of just over $71,000. The jury was not willing to accept either side's evidence at face value. Rather, the jury awarded $122,689 in damages for reasons that are not immediately apparent from the record. The point is that defendant had the opportunity to present evidence to rebut plaintiff's assertion that the reasonable value of the services was the full amount of the charges, and apparently the jury agreed that in some instances the bills had been unreasonably inflated. Thus, we reject defendant's belated attack on the sufficiency of plaintiff's evidence to sustain her burden of proof.

## II

### Discovery: Motion to Compel Disclosure of MedFin Payment Agreement and Imposition of Sanctions

The more difficult question is whether the trial court abused its discretion by denying defendant's motion to compel Dr. Orisek to disclose the terms of his agreement with MedFin and by imposing $2,500 in sanctions against defendant. Because the trial court erroneously concluded that the agreement between MedFin and Dr. Orisek was irrelevant, the ruling was based upon a misinterpretation of applicable law, and therefore an abuse of discretion has been shown. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at p. 1294.) Nevertheless, we conclude the discovery error was not prejudicial. The sanctions, however, must be reversed.

It is true that the management of discovery generally lies within the trial court's discretion and appellate courts are "highly deferential to the trial court." (*Lickter v.*

*Lickter* (2010) 189 Cal.App.4th 712, 740.)  But as defendant correctly reminds us, "In the context of discovery, evidence is 'relevant' if it might reasonably assist a party in evaluating its case, preparing for trial, or facilitating a settlement.  Inadmissibility is *not* the test, and it is sufficient if the information sought might reasonably lead to other, admissible evidence."  (*Glenfed Development Corp. v. Superior Court* (1997) 53 Cal.App.4th 1113, 1117.)  "Any doubts regarding relevance are generally resolved in favor of allowing the discovery."  (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 98.)  Moreover, the broad scope of permissible discovery "is equally applicable to discovery of information from a nonparty as it is to parties in the pending suit."  (*Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1062.)

In denying the motion to compel, the trial court wrongly concluded that Dr. Orisek's written agreement with MedFin for the sale of his bills and liens was irrelevant.  We have concluded that the evidence surrounding the sale of the bills and liens to MedFin does bear some probative value in determining the reasonable value of the services.  And given the breadth of a party's right to discover any information that might assist him in evaluating or preparing his case, we must conclude the court erred by refusing to compel the disclosure of the agreement.[1]

Nonetheless, defendant cannot demonstrate prejudice.  This is not an instance in which the denial of discovery compromised defendant's preparation for trial or led to surprise, the usual basis for establishing prejudice where discovery is improperly denied.  Rather, the discovery motion presaged the later effort to secure admission of the same information at trial.  The trial court reconsidered the essence of the motion to compel during the motions in limine at trial.  Defendant sought to persuade the jury that the

---

[1]  We note that the trial court did not address Dr. Orisek's claim of privacy.  We need not consider the issue on appeal because we conclude the trial court's error was not prejudicial.

28

reasonable value of the services was reflected in the amounts the providers were willing to accept from MedFin. The record reflects a long discussion between the court and defense counsel regarding the probative value of the agreements with MedFin and the amount it paid. Although in its pretrial ruling, the court found the evidence was irrelevant, at trial the court recognized the potential probative value of the evidence to bolster the defense expert's opinion about the reasonable value of the medical services the plaintiff received. As a result, ultimately the evidence was excluded, not because it had no probative value, but because it raised a vast assortment of collateral issues about why Dr. Orisek accepted a reduced amount from MedFin. The court explained, "Could be the doctor was about to file bankruptcy and he needed the money. Could be he's not interested in collections. Could be a lot of reasons. He owed a debt to someone else." In other words, the danger of confusing or misleading the jury by litigating these many collateral matters far surpassed whatever probative value the evidence had to prove reasonable value.

We conclude, therefore, that on the record before us the court would have excluded the evidence at trial even if it had granted the defense motion to compel disclosure of the agreement before trial. Although before trial the court expressed the misguided notion the evidence was irrelevant and not discoverable, even if it had allowed the discovery it would have excluded the evidence at trial. Consequently, the pretrial error in denying the motion to compel disclosure of the agreement was harmless.

We therefore will reverse the sanctions award but note that defense counsel's failure to meet and confer can also serve as a basis for sanctions. Indeed, plaintiff's counsel, in seeking to meet and confer, produced all of the documents requested except the contract between Dr. Orisek and MedFin. The failure to participate in the meet-and-confer process in good faith is an independent discovery abuse "for which sanctions are statutorily authorized." (*Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1104.)

29

Contrary to the trial court's ruling on admissibility, however, the motion to compel was justifiable on the merits, and plaintiff offers no other instances of obstruction or unreasonable behavior by defendant during discovery. We therefore conclude that although defendant skirted some of the procedural prerequisites to his motion by failing to meet and confer, the primary basis for the award was the trial court's erroneous belief that the information sought to be discovered was totally irrelevant. As we have concluded that the evidence is not irrelevant as a matter of law, we will reverse the penalty imposed on defendant for bringing what actually turned out to be a meritorious motion.

## III

## Directed Verdict on Causation

The word "presumably" plays a pivotal role in defendant's challenge to the directed verdict. At its core, defendant would have us reverse a judgment entered on a jury verdict based on the presumed injuries plaintiff must have suffered in a "presumably" high speed, high impact, rollover accident 12 years before the collision with defendant. While the opening brief is peppered with such "presumptions," the problem is defendant failed to present any evidence at trial to support the "presumed" cause of plaintiff's injuries—not the collision with defendant, but the accident that occurred 12 years earlier. "Presumably" translates into speculation. And as defendant recognizes, raw speculation does not justify reversal of a directed verdict. (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 669.) Turning to the actual record, there is simply no evidence that anything other than the 2008 collision with defendant caused plaintiff's injuries.

Indeed, all the doctors agreed that it was more probable than not that plaintiff's disk protrusion was caused by her 2008 collision with defendant. This opinion was shared by her treating physician, her orthopedic surgeon, and defendant's orthopedic spine expert. The expert testimony was uncontradicted. Defendant did not subpoena

30

plaintiff's medical records from before she saw Dr. Diaz. He did not present any evidence about the earlier accident or seek to demonstrate that plaintiff had suffered injuries of any type, and he does not claim that he was prevented from deposing her past health care providers about injuries she might have suffered in that accident. Rather, he simply urges us to draw inferences based on nothing more than sheer speculation.

We agree with plaintiff that the trial court did not direct a verdict based on a "misapprehension" that defendant had admitted to causation, nor did the court rule that defendant was 100 percent responsible for plaintiff's past medical expenses. Plaintiff's counsel corrected an isolated remark the trial court made that defendant had "admitted [his] negligence was a substantial factor of injuries," advising the court defendant had admitted his negligence was a substantial factor in causing the incident, not the injuries. Thus, the court was under no misapprehension.

Nor did the court rule that defendant was responsible for 100 percent of plaintiff's medical expenses. What the court actually told the jury was: "The question of whether the defendant's negligence was a substantial harm [*sic*] in causing harm to the Plaintiff, Ms. Moore.

"I have ruled that based upon the evidence that's been presented to you, before you, that the answer to that is, yes. So you will not decide whether the defendant's conduct, the collision, was the cause of the harm. [¶] . . . [¶]

"So the only question before you will be the issue of Ms. Moore's damages." The court thereafter instructed the jury: "To recover damages for past medical expenses, Lilly Moore must prove the reasonable cost of reasonably necessary medical care that she has received." Nowhere did the court state or imply that defendant was 100 percent responsible for her medical expenses. As it turned out, the jury awarded her less than the damages she sought.

"A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to

31

which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629-630.) The record discloses there was no evidence of sufficient substantiality to support the defense claim that the earlier accident was a substantial factor in causing plaintiff's injuries. While there was a mere mention that the accident had occurred, there is absolutely no evidence that it caused plaintiff ongoing injuries and pain. Given the unanimity among the experts that it was more probable than not that the 2008 collision was a substantial factor in causing the damages plaintiff incurred to secure the medical treatment she received, we conclude the trial court properly directed the jury in plaintiff's favor on the issue of causation.

## DISPOSITION

The $2,500 sanctions order is reversed. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)


                                                                    RAYE            , P. J.


We concur:


        BLEASE         , J.


        MURRAY        , J.


32