Filed 12/9/20  Hart v. Keenan Properties CA1/5
On remand

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CYNTHIA HART,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>KEENAN PROPERTIES, INC.,<br>     Defendant and Appellant. | A152692<br><br>(Alameda County<br>Super. Ct. No. RG16838191) |

This case returns to us from the California Supreme Court "for consideration of . . . contentions left unresolved" by a previous appeal, following a jury verdict in favor of the plaintiffs, Frank C. Hart and Cynthia Hart (collectively, the Harts).  (*Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 454.)  In this opinion, we address the claims of defendant Keenan Properties, Inc. (Keenan) that the trial court "improperly allowed medical cost testimony from Plaintiffs' expert based on unpaid medical charges," and abused its discretion by understating Keenan's setoff against economic damages based upon proceeds of settlements with other defendants. We affirm.

1

## FACTUAL AND PROCEDURAL HISTORY

Mr. Hart suffered from mesothelioma, which is caused by exposure to asbestos.[1]  From September 1976 to March 1977, he worked in McKinleyville, California, and his job involved cutting asbestos-cement pipe for new sewer lines.  On November 8, 2016, the Harts filed a complaint for personal injury and loss of consortium against numerous entities, including Keenan.  By the time of trial, Keenan was the only remaining defendant, all other defendants having settled or been dismissed.

The jury returned its verdict finding Keenan supplied the pipe to the McKinleyville site that exposed Mr. Hart to asbestos.  As to the personal injury cause of action, the jury awarded $1,821,050 in economic damages and $3,000,000 in noneconomic damages for pain and suffering.  As to the loss of consortium cause of action, the jury awarded $500,000 to Mrs. Hart.  The jury allocated fault among ten entities, finding Keenan was 17 percent at fault.

In its amended judgment, the court apportioned 45 percent of prior settlements to potential future wrongful death claims.  After accounting for portions of the settlement proceeds attributable to noneconomic and loss of consortium damages, the court determined that the remainder, $789,532.18, was Keenan's credit against the economic damages awarded by the jury.  It is this figure that Keenan contends "was substantially and wrongfully altered" by the court's allocation of 45 percent of prior settlement funds to a future wrongful death action, which would presumably include Mrs. Hart as a plaintiff.  Based on the credit against economic damages and comparative fault reductions to the noneconomic damages, the net verdict against Keenan was $1,626,517.82.

---

[1] Mr. Hart passed away on October 3, 2019.  On June 29, 2020, we substituted Mrs. Hart as successor in interest to Mr. Hart.

On appeal, Keenan raised a number of issues including whether the trial court properly admitted evidence that Keenan was the supplier of the pipes. On May 21, 2020, the California Supreme Court held that a foreman's observation of Keenan's name and logo on invoices was circumstantial evidence of Keenan's identity as the source of the pipes, and, thus, the trial court properly admitted the evidence. (*Hart v. Keenan Properties, Inc.*, *supra*, 9 Cal.5th at pp. 447, 449–450.)

## DISCUSSION

In this opinion, we address Keenan's remaining appellate arguments. We begin with Keenan's challenge to Mr. Hart's medical costs.

I.      *The Trial Court's Evidentiary Rulings Regarding Mr. Hart's Medical Expenses*

Keenan argues there was no evidence the Harts paid or were liable for medical expenses, and that an expert relied upon documents that "did not provide a reasonable basis for his opinions." We disagree.

A.      *Governing Law and Standard of Review*

We review a trial court's evidentiary rulings for an abuse of discretion. (*Moore v. Mercer* (2016) 4 Cal.App.5th 424, 444 (*Moore*).) We review de novo whether a plaintiff is entitled to a particular measure of damages. (*Pebley v. Santa Clara Organics, LLC* (2018) 22 Cal.App.5th 1266, 1273.) "The amount of damages, however, is a question of fact. The award will not be disturbed if it is supported by substantial evidence." (*Ibid.*)

Damages for past medical expenses are limited to the lesser of (1) the amount paid or incurred, and (2) the reasonable value of the services. (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 556 (*Howell*).) When a plaintiff's insurer negotiates an amount less than the medical provider's ordinary rates, the plaintiff may not recover the full or ordinary rates, even if they are reasonable, because the plaintiff "never

3

incurred the full bill." (*Id.* at p. 563.) *Howell*'s holding is that "an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Id.* at p. 566.)

*Howell* also addressed cases involving a medical provider's lien against the plaintiff's judgment. (*Howell, supra*, 52 Cal.4th at pp. 553–554.) For example, in *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, the Court of Appeal found a medical provider's lien did "not extend beyond the amount it agreed to receive from" an insurance company. (*Id.* at p. 307.) Similarly, in *Parnell v. Adventist Health System / West* (2005) 35 Cal.4th 595, our high court held that a hospital that asserted a lien against a patient's judgment could not seek to recover from the patient "the difference between its usual and customary charges and the amount received from the patient and his insurer" when it "agreed to accept that payment as 'payment in full' for its services." (*Id.* at p. 598.)

By contrast, in cases involving a medical provider's lien against an uninsured plaintiff's recovery, the plaintiff generally remains liable for the full amount billed, and that amount is admissible and relevant when considering the reasonable value of the uninsured plaintiff's medical care. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1330–1331, 1336; *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1295–1296.) Similarly, if an insured plaintiff receives treatment from doctors not covered by his or her insurance, the plaintiff is personally liable for the medical costs, and the plaintiff may introduce evidence of the "billed charges" and expert witness testimony to establish the reasonable value of the services rendered. (*Pebley v. Santa Clara Organics, supra*, 22 Cal.App.5th at p. 1278.)

B.   *Dr. Horn's Testimony Regarding Medical Expenses*

To prove Mr. Hart's medical costs, the Harts relied on the expert testimony of Barry Horn, M.D.[2]  Before permitting Dr. Horn to testify before the jury, the court conducted an Evidence Code section 402 hearing.[3]

1.   *The Section 402 Hearing*

For purposes of the hearing, the court marked exhibits for identification.  They included a letter from an entity called The Rawlings Company providing notice that Kaiser Foundation Health Plan, Inc. (Kaiser) was its client, and stating "our client has a lien for medical benefits paid or furnished on behalf of" Mr. Hart.  The letter further indicates that the lien is of first priority and pertains to any recovery obtained, whether by judgment, settlement or compromise.  The exhibits also included the Rawlings summary, which is a 22-page chart describing Mr. Hart's treatment from September 2016 to May 2017, which included charges under columns labeled "Bill Amount" and "Paid Amount."  The amounts in these columns are the same, and they total $471,395.60.[4]

---

[2] Earlier in the trial, Dr. Horn testified regarding Mr. Hart's disease and its cause.

[3] Undesignated references are to the Evidence Code.  Section 402 provides in part that "[w]hen the existence of a preliminary fact is disputed," the court "may hear and determine the question of the admissibility of evidence out of the presence . . . of the jury."

[4] Although the heading on each page of the Rawlings summary states, "Paid Amount Subject to Change," the Rawlings letter states:  "The amount of the lien is subject to change based on charges for additional services related to the injuries or illnesses."  The exhibits also included another document listing various charges for Mr. Hart's treatment.  The significance of this document was never explained to the court at the section 402 hearing.  Most importantly, when testifying before the jury, Dr. Horn relied only on the Rawlings summary regarding the amount of Mr. Hart's past medical care and was not questioned about this other document.

During the hearing, Dr. Horn acknowledged he was not familiar with Kaiser's billing practices and did not know how Kaiser creates or negotiates its bills. Dr. Horn had previously seen a document similar to the Rawlings summary, but he was not familiar with The Rawlings Company. Dr. Horn did not know if Kaiser had a lien on the Harts' judgment or if anyone paid Mr. Hart's medical bills. However, regarding the amounts in the Rawlings summary, Dr. Horn stated "the bulk of the money here is for . . . chemotherapy," and he opined that other institutions around the United States have billed similar or higher amounts for the same treatment.

Keenan twice stated that it objected to "Dr. Horn's testimony on medical billing" under *Howell, supra*, 52 Cal.4th at page 566. Keenan argued "the record establishes that Dr. Horn doesn't have any personal knowledge regarding . . . Kaiser billing," and that the notice of a lien was not evidence any entity paid for Mr. Hart's treatment. The Harts responded that "there is a notice of lien and . . . the Rawlings billing records are the breakdown of what will be enforced by lien." They argued they were "on the hook for the full amount billed by virtue of the lien," and that The Rawlings Company was "going to enforce a lien for the care provided by Kaiser."

The trial court stated "there's not a Kaiser case on point that I'm aware of, . . . [but] there is case law [that] . . . in the absence of any evidence that there is a negotiated amount, if there's evidence that the plaintiff is potentially liable or on the hook or responsible for the total paid amount, I think the case law generally says that's the amount that goes to the jury." The trial court overruled "the request to exclude Dr. Horn's testimony before the jury, not on the lien. That's not going to go to the jury one way or the other. That's why we had this hearing."

6

## 2.        *Dr. Horn's Testimony Before the Jury*

In his testimony to the jury, Dr. Horn stated he reviewed the Rawlings summary, which he described as providing "a detailed summary of the care that was delivered for mesothelioma, specifically for the mesothelioma from September 30, 2016 . . . to May 5, 2017." Dr. Horn testified that the cost of Mr. Hart's past medical care was $471,395.[5]

Dr. Horn was a physician at Alta Bates Hospital, and, from 1985 to 2000, he was the "medical director of clinical quality and resource management" at the hospital. In this role and others, Dr. Horn "learned an enormous amount about the cost of care and delivery of care . . . all over the United States."

When asked, on direct examination, "if this total amount [for Mr. Hart's medical care] . . . was actually incurred by Mr. Hart," Dr. Horn stated: "I don't know that." However, Dr. Horn opined that, based on his experience, the total amount charged was reasonable. Dr. Horn opined that Mr. Hart was not likely to live for longer than another year, and he estimated the cost of Mr. Hart's future care would range from $50,000 to $150,000.[6] Defense counsel did not cross-examine Dr. Horn before the jury. Instead, defense counsel renewed "its objections previously from this morning."[7]

---

[5] Dr. Horn omitted 60 cents from the total stated in the Rawlings summary.

[6] In fact, Mr. Hart lived for over two more years.

[7] Dr. Horn testified regarding both the cost of Mr. Hart's care and its reasonableness. By doing so, he "relate[d] as true case-specific facts asserted in hearsay statements." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.) Keenan did not object at trial (or argue in its opening appellate briefs) that Dr. Horn's testimony was hearsay or that it was inadmissible under *Sanchez*, even though *Sanchez* was decided in June 2016, about a year before the Harts' trial. Accordingly, Keenan forfeited this challenge. (*People v. Stevens* (2015) 62 Cal.4th 325, 333 ["the failure to object to the admission of

C.   *No Abuse of Discretion in Permitting Dr. Horn to Testify*
     *Regarding the Cost of Mr. Hart's Medical Treatment*

On appeal, Keenan claims "[t]he evidence of medical charges presented to the jury was based on improper matter and therefore inadmissible. Keenan complains that "[t]he notice of lien from Kaiser does not constitute evidence of medical expenses actually incurred," that the Harts "did not produce any evidence of amounts owed for Mr. Hart's treatment," and "[i]f the existence of a lien indicates a debt is owed, there is no evidence in this case regarding how much, or to whom."

Keenan is wrong.  The Rawlings summary is evidence of the amount Mr. Hart or Kaiser incurred for Mr. Hart's medical treatment from September 2016 to May 2017, and there was also evidence Kaiser has or had a lien against the Harts' judgment as a means of recouping its costs. Therefore, the Harts met their burden of showing that they (or their insurer) incurred medical expenses and the amount incurred.  (*Moore, supra,* 4 Cal.App.5th at p. 437.)

We recognize that in many cases involving insured plaintiffs, the insurer negotiates a discounted rate from medical providers, and the discounted amount caps the plaintiff's recovery.  (*Howell, supra,* 52 Cal.4th at p. 555.)  In those circumstances, it also caps the amount a hospital can recover based on the hospital's lien against any judgment or settlement the injured patient obtains from the tortfeasor.  (See, e.g., *Parnell v. Adventist Health System/West, supra,* 35 Cal.4th at pp. 598, 609.)

But here, there was no evidence of a discounted rate or that

_____

expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted"]; cf. *People v. Perez* (2020) 9 Cal.5th 1, 9 [failure "to object at trial before *Sanchez* was decided did not forfeit a claim on appeal"].)

8

Kaiser would accept a lesser amount as full satisfaction of its lien.[8]  As a result, Keenan's reliance on cases like *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1328, in which the medical provider agreed to a discounted rate for the services provided, is misplaced.  Here, based on the Rawlings summary and Kaiser's lien, Kaiser can recover the full amount charged, and Dr. Horn testified that the amount was reasonable.  (*Howell*, *supra*, 52 Cal.4th at p. 551 ["any reasonable charges for treatment the injured person has paid or, having incurred, still owes the medical provider are recoverable as economic damages"].)

As explained in *Pebley v. Santa Clara Organics, LLC*, *supra*, 22 Cal.App.5th at pages 1275 to 1276, which also involved a plaintiff who had Kaiser insurance, "if the plaintiff has an expert who can competently testify that the amount incurred and billed is the reasonable value of the service rendered, he or she should be permitted to introduce that testimony. The defendant may then test the expert's opinion through cross-examination and present his or her own expert opinion testimony that the reasonable value of the service is lower."  Notably, Keenan failed to offer any expert testimony challenging the reasonableness of the charges in the Rawlings summary, or challenging Kaiser's ability to recoup the full amount charged based on its lien.  We conclude the trial court did not abuse its discretion by permitting Dr. Horn to testify regarding the cost of Mr. Hart's medical care.

In arguing otherwise, Keenan relies on *Katiuzhinsky v. Perry, supra*, 152 Cal.App.4th at page 1291, and *Moore*, *supra*, 4 Cal.App.5th at page 444, but these cases hurt rather than help Keenan's argument.  In both of these cases, evidence of the full amounts billed was relevant and admissible because the plaintiffs remained liable for the full amounts even after hospital

---

[8] To the contrary, the Rawlings summary indicates the billed and paid amounts are the same.

liens were sold to a medical finance company. (*Katiuzhinsky*, at p. 1291; *Moore*, at pp. 438–441, 444.) Similarly here, the Rawlings summary shows the amounts charged for Mr. Hart's medical treatment, and, in the absence of evidence that Kaiser would accept less to satisfy its lien, we can reasonably infer Mr. Hart or Kaiser incurred those expenses. (*In re Eric S.* (2010) 183 Cal.App.4th 1560, 1565 [victim, who was a Kaiser member, could obtain restitution for medical expenses because, even if the victim did not pay them, the "charges were nonetheless incurred on his behalf"].)

Here, unlike in *Moore*, *supra*, 4 Cal.App.5th at page 446, there was no testimony from the plaintiff that he incurred the charges reflected in the summary of bills, and his treating physicians did not testify either. Typically, the parties will either stipulate to the admissibility of a summary of the plaintiff's medical bills (*Bermudez v. Ciolek*, *supra*, 237 Cal.App.4th at p. 1324), or doctors or other hospital representatives will testify regarding the amounts. (*Moore*, at p. 446.) Concerns about disclosing to the jury that Mr. Hart was a Kaiser member or that Kaiser had a lien against his judgment may have been a factor in the Harts' decision to rely exclusively on Dr. Horn to present evidence of Mr. Hart's medical expenses to the jury. (*See Howell*, *supra*, 52 Cal.4th at pp. 552, 563 [describing evidentiary aspect of collateral source rule].) The trial court was correctly concerned about violating the collateral source rule by allowing in evidence of insurance coverage.[9]

---

[9] "The collateral source rule states that 'if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.' " (*Howell*, *supra*, 52 Cal.4th at p. 551.) Generally, evidence that a collateral source paid or incurred the costs of an injured plaintiff's medical treatment is inadmissible. (*Id.* at p. 552.)

Nevertheless, at the section 402 hearing, Keenan did not dispute that Mr. Hart received medical care, that there were charges for his treatment, or that Kaiser had a lien against the judgment.[10]  Similarly, on appeal, Keenan does not dispute the existence of Kaiser's lien, and Keenan acknowledges the Rawlings summary may have evidentiary value as "a billing statement." Based on the court's legitimate concern about disclosing the Kaiser lien to the jury, and in the absence of any evidence that Kaiser would accept less than the full amount to satisfy its lien, we conclude that Dr. Horn's testimony regarding the cost of Mr. Hart's medical care was sufficient to meet Mr. Hart's burden of proving he incurred those costs.  (*Moore*, *supra*, 4 Cal.App.5th at pp. 446–447.)

D.    *Keenan Forfeited Its Challenge to Dr. Horn's Opinion Regarding the Future Cost of Mr. Hart's Medical Care*

As well as testifying regarding the cost of Mr. Hart's treatment from September 2016 to May 2017, Dr. Horn also opined regarding the likely future cost of Mr. Hart's medical treatment.  Relying on *Corenbaum v. Lampkin*, *supra*, 215 Cal.App.4th at page 1331, Keenan argues this opinion was "not supported by a reasonable basis and must also be excluded," and Keenan implies that Dr. Horn's opinion was based on evidence of the full amount charged.  We deem the argument forfeited.

Objections to the admissibility of evidence must be timely and specific. (§ 353, subd. (a).)  " 'Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party

---

[10] Keenan claims the Harts mischaracterize what was undisputed, and Keenan points to its counsel's statement that plaintiffs are not " 'responsible for the lien if there's no recovery in this case.' "  But this statement shows Keenan did not dispute the existence of Kaiser's lien.  Indeed, it presumes the Harts would be responsible for the lien if there were a recovery—the very reason to base an award on that figure in order to make the plaintiffs whole.

proffering the evidence to cure the defect in the evidence.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) The failure to raise a specific objection to the admission of evidence results in forfeiture of appellate review. (*People v. Doolin* (2009) 45 Cal.4th 390, 434.)

Here, Keenan did not object at trial to Dr. Horn's testimony regarding future medical costs. Keenan claims to have objected at the section 402 hearing, but during that hearing Keenan examined Dr. Horn regarding the Rawlings summary, which is a summary of past medical expenses, and Keenan moved to exclude Dr. Horn's testimony "on medical billing," not future expenses.[11] As a result, Keenan forfeited its challenge to Dr. Horn's testimony regarding Mr. Hart's future medical costs.

Even if the argument was not forfeited, the record does not support Keenan's claim that Dr. Horn based his testimony on the Rawlings summary. Instead, Dr. Horn relied on his general experience as a physician and hospital director, which provided a reasonable basis for his opinion regarding future medical costs. (§ 801, subd. (b).) We reject Keenan's challenge to this testimony.

II. *Including Mrs. Hart's Wrongful Death Claim When Considering How to Allocate Past Settlements*

Next, we consider Keenan's challenge to the allocation of past settlements between this action and a prospective wrongful death case.

---

[11] Notably, Keenan did not cross-examine Dr. Horn on this point, either at the section 402 hearing or before the jury. Indeed, even though Keenan deposed Dr. Horn a second time late in the trial, Keenan still had no specific objections to the lien or his testimony regarding the reasonableness of Mr. Hart's medical expenses.

A. *Governing Law and Standard of Review*

Under Civil Code section 1431.2,[12] principles of comparative fault apply to a defendant's liability for noneconomic damages, including damages for loss of consortium. (*Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1006; *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 863.) A defendant's liability for economic damages is not subject to an adjustment for its share of comparative fault because defendants are jointly liable for economic damages. (*Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233, 1239 (*Hackett*).) However, under Code of Civil Procedure section 877,[13] a defendant is entitled to a credit against its liability for economic damages for any portion of settlement proceeds that are properly attributable to the claims for economic damages resolved at trial. (*Hackett*, at p. 1239.)

When the settlements do not apportion the settlement funds between economic and noneconomic damages, the determination of a nonsettling defendant's credit is straightforward: the posttrial allocation should mirror

---

[12] The section provides in part: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Civ. Code, § 1431.2, subd. (a).) Subdivision (b)(2) provides that "non-economic damages" include "loss of consortium."

[13] This provision provides in part that "[w]here a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater."

the jury's apportionment of economic and noneconomic damages. (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 276–277; *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 840–841.) For example, in *Espinoza*, one of the defendants settled, the plaintiff obtained a judgment against the nonsettling defendant, and economic damages comprised 29 percent of the total judgment. (*Espinoza*, at pp. 276–277.) The Court of Appeal held that for purposes of calculating the credit, 29 percent of the settlement should be attributed to economic damages to mirror the fact finder's apportionment of damages. (*Ibid*.)[14]

The calculation of the credit is more complicated when the settlements purport to encompass claims not resolved at trial or specify an allocation of the settlement funds. As explained in *Hackett*, when the settlements claim to encompass the husband's personal injury claim, the wife's loss of consortium claim, and the heirs' potential future wrongful death claims, the credit should be calculated as follows: "First, excluding the wife's loss of consortium damages, determine the ratio of economic to total damages as awarded by the jury. Second, subtract from the amount of the pretrial settlement the portions of the settlement properly found to be allocable to the wife's loss of consortium claim and the heirs' potential wrongful death claims. Third, multiply the two figures together to determine the amount of the defendant's settlement credit for economic damages." (*Hackett, supra*, 98 Cal.App.4th at p. 1240.)

"The trial court has wide discretion in allocating portions of a prior settlement to claims not adjudicated at trial." (*Hackett,* supra, 98 Cal.App.4th at p. 1242.) Applying this standard requires us to "examine

---

[14] The ratio of the economic damages to the total compensatory damages is often referred to as "the *Greathouse* ratio." (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1319.)

the court's findings, whether express or implied, for the existence of substantial evidence." (*Pfeifer v. John Crane, Inc.*, *supra*, 220 Cal.App.4th at p. 1321.)

B.     *The Proceedings Below*

Here, based on Mr. Hart's personal injury cause of action, the jury awarded $1,821,050 in economic damages, $3,000,000 in noneconomic damages for pain and suffering, and, for Mrs. Hart's loss of consortium cause of action, they awarded $500,000. The jury found Keenan was 17 percent at fault, and, as a result, the court initially entered judgment against Keenan in the amount of $2,416,050, which reflected the full amount of the jury's award for economic damages, and 17 percent of the award of noneconomic damages.[15]

The trial court subsequently heard argument from the parties regarding the appropriate calculation of a credit against Keenan's economic damages based on prior settlements. The Harts averred they settled with seven defendants, releasing them from all actual and potential claims. The aggregate amount of the settlement agreements was $4,195,000. According to the Harts, in all but one case, the settling parties allocated 50 percent of the settlement to Mr. Hart's personal injury claim and Mrs. Hart's pre-death loss of consortium claim, and 50 percent to potential future wrongful death claims.[16]

Keenan argued below that a 50/50 allocation would be improper; instead, Keenan proposed that the settlement proceeds should be allocated

---

[15] Seventeen percent of $3,500,000 is $595,000. $1,821,050 plus $595,000 is $2,416,050.

[16] According to a declaration submitted below, the settlement agreements were submitted to the trial court for in camera review. They are not part of the record on appeal.

75.6 percent to Mr. Hart's personal injury claim, 9.4 percent to Mrs. Hart's loss of consortium claim, and 15 percent to potential future wrongful death claims. One of Keenan's arguments was that Mrs. Hart should not be included among the potential wrongful death heirs because she alleged a "permanent" loss of consortium. Relying on *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788 (*Boeken*), Keenan argued she was barred by principles of res judicata from seeking such damages in a wrongful death action.

In its order regarding the apportionment of settlement credits, the trial court rejected Keenan's argument. The trial court found that the Harts "did not allege a 'permanent' loss or expressly seek any damages beyond the date of plaintiff's premature death." Based on the language of the jury instructions, the verdict form, and the arguments of counsel, the court found "the jury was not asked to consider permanent loss of companionship, but solely pre-death loss of consortium," and "a claim for a permanent loss was not litigated or resolved in this case." The trial court found that "Mrs. Hart remains as a potential wrongful death heir along with the adult children of plaintiff."

The trial court allocated 45 percent of the prior settlement proceeds to the wrongful death action. In the amended judgment, after deducting 45 percent of the settlement proceeds, the trial court also deducted 9.4 percent of the remaining settlement proceeds as attributable to the loss of consortium damages, and then it determined, based on the *Greathouse* ratio, that the amount of the appropriate settlement credit available to Keenan against its economic damages was $789,532.18.

16

## C. *No Abuse of Discretion in the Allocation Decision*

On appeal, Keenan reiterates its argument that the trial court "improperly included . . . [Mrs. Hart] as a prospective wrongful death heir when allocating prior settlements between the personal injury action and prospective wrongful death claim[s]." Keenan disagrees with the trial court's finding that the complaint did not allege a permanent loss of consortium claim, Keenan contends the jury instructions and the verdict form were ambiguous, and Keenan argues that under *Boeken, supra,* 48 Cal.4th at page 804, and principles of res judicata, Mrs. Hart is barred from seeking loss of consortium damages in a wrongful death action. It follows from these points, Keenan implies, that no portion of settlement proceeds should have been attributed to Mrs. Hart's wrongful death action. And thus, the settlement proceeds attributable to this action and the related setoff here should have been greater.

Keenan's first argument is belied by the record, which does not support Keenan's argument that Mrs. Hart alleged a "permanent" loss of consortium. Instead, the complaint alleged Mrs. Hart's loss of consortium damages were "presently unknown," but would be "proved at time of trial." As Keenan points out, paragraph 168 of the complaint—part of the loss of consortium cause of action—incorporated by reference the earlier allegations, and, in paragraph 15, it was alleged that "Plaintiff was exposed to respirable asbestos, which he inhaled and which thereby entered his body, and which caused the severe and permanent harm set forth herein." In addition, in paragraph 16, the Harts alleged that "Plaintiff suffered permanent injuries." But the complaint defined "Plaintiff," in paragraph 1, as Mr. Hart. Therefore, the complaint alleged Mr. Hart suffered permanent harm or

17

injuries, and there is no specific allegation regarding the duration of Mrs. Hart's loss of consortium claim.

Keenan contends the trial court "abused its discretion" by finding the Harts did not allege a "permanent" loss of consortium and implies the trial court's interpretation of the complaint was unreasonable. "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479.) Here, based on the allegations, the trial court's interpretation of the complaint was reasonable. We defer to its conclusion that the complaint did not allege a permanent loss of consortium.[17]

Next, Keenan claims the jury instructions and the special verdict form were ambiguous. The jury was instructed that Mrs. Hart "may recover for harm she proved she has suffered to date," and the special verdict form required the jury to award loss of consortium damages "measured from the date of Frank Hart's mesothelioma diagnosis to the date of his projected death."

Generally, a party forfeits an appellate challenge to a trial court's instruction or the special verdict form by failing to object below or before the trial court discharges the jury. (*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 856–857 [jury instruction]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [special verdict form].) Here, there is no indication Keenan objected at trial to either

---

[17] Even if we assume the word "permanent" was incorporated into the loss of consortium cause of action, the Harts may have simply intended to allege that the loss was more than "temporary." (*Anderson v. Northrop Corp.* (1988) 203 Cal.App.3d 772, 780.) Nevertheless, Keenan fails to show the trial court's interpretation of the complaint was unreasonable.

this instruction or the language at issue in the special verdict form. Therefore, we deem Keenan's argument forfeited.

Even considering the argument, it was certainly reasonable for the trial court to find that "the jury was not asked to consider permanent loss of companionship, but solely pre-death loss of consortium."[18] Indeed, Keenan's suggestion that the jury verdict may have encompassed post-death loss of consortium damages is unreasonable. Keenan's argument depends on the assumption that the jury may have awarded loss of consortium damages from the date of Mr. Hart's mesothelioma diagnosis to the date of his " 'projected death' given the median life expectancy for someone Mr. Hart's age." But the jury was told that, as a result of Mr. Hart's mesothelioma, he was not likely to live for longer than another year. It makes no sense that the jury would have considered " 'projected death' " to mean the median life expectancy of someone not diagnosed with mesothelioma.

Keenan's final point—regarding res judicata—fares no better. "Res judicata bars a cause of action that was or could have been litigated in a prior proceeding if: '(1) the present action is on the same cause of action as the prior proceeding; (2) the prior proceeding resulted in a final judgment on

---

[18] Without a citation to the record, Keenan argues the "jury instructions and special verdict form were unknown to the settling defendants in the personal injury action at the time of their settlements. The only information the settling defendants had was Mrs. Hart's allegation of 'permanent' harm as stated in her Complaint." But we do know that, in all but one case, the settling defendants agreed to allocate 50 percent of their settlements to potential wrongful death claims. While the trial court was not bound by that allocation (*Jones v. John Crane, Inc., supra,* 132 Cal.App.4th at p. 1009), it nevertheless indicates the settling defendants viewed the potential wrongful death damages as significant. Moreover, given its claim regarding the scope of Mrs. Hart's allegation in the complaint, Keenan can hardly argue that the other defendants did not settle any potential wrongful death claims with Mrs. Hart, including post-death loss of consortium damages.

the merits; and (3) the parties in the present action or parties in privity with them were parties to the prior proceeding. [Citation.]' " (*Federal Home Loan Bank of San Francisco v. Countrywide Financial Corp.* (2013) 214 Cal.App.4th 1520, 1527.) The doctrine of res judicata " ' "gives certain *conclusive effect* to a *former judgment* in subsequent litigation involving the same controversy." ' " (*Boeken, supra*, 48 Cal.4th at p. 797.)

Here, the doctrine of res judicata does not apply because, at the time of the trial court's allocation decision, there was no prior proceeding or former judgment. Whether Mrs. Hart is barred from seeking wrongful death damages because she asserted a claim for loss of consortium in this personal injury action is a question that should be decided, if at all, in the pending wrongful death action, not here.[19] (*Boeken*, *supra*, 48 Cal.4th at pp. 791–792 [considering whether principles of res judicata barred plaintiff's "current wrongful death action"].)

Moreover, whether Mrs. Hart is precluded from seeking post-death loss of consortium damages in a wrongful death action and whether she was required to seek them here misses the point. Based on the language in the special verdict form, we agree with the trial court that she *did not* receive such damages here. But she obviously did receive such damages by way of settlement with other defendants, and in this action Keenan "was entitled to credit only insofar as *economic* damages were compensated by settlement." (*Wilson v. John Crane, Inc.*, *supra*, 81 Cal.App.4th at p. 863.)

[19] In their supplemental briefing, Keenan requests judicial notice of the wrongful death complaint filed in March 2020, and Mrs. Hart requests judicial notice of a stipulation to stay the wrongful death action and her request for dismissal of her loss of consortium claim in the wrongful death action. We grant the unopposed requests. We take judicial notice of the fact the wrongful death complaint was filed, not the truth of any of its allegations. (*Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075.)

The range of settlement proceeds courts have allocated to potential future wrongful death claims varies widely—from zero to 50 percent—and it generally depends on the evidence presented to justify a proposed allocation. (*Jones v. John Crane, Inc.*, *supra*, 132 Cal.App.4th at pp. 1008, 1010–1011 [no abuse of discretion in trial court's refusal to allocate any portion of prior settlements to potential wrongful death claims because there was no information regarding the number of heirs or the nature of their relationship with the decedent]; *Hackett*, *supra*, 98 Cal.App.4th at pp. 1241–1242 [no abuse of discretion in trial court's allocation of 34 percent of the settlement to potential future wrongful death claims based on evidence of plaintiff's relationship with his wife and sons]; *Hellam v. Crane Co.* (2015) 239 Cal.App.4th 851, 858, 860–862 [no abuse of discretion in allocating 50 percent of settlement proceeds to future wrongful death claims because evidence of plaintiff's relationship with sons provided a reasonable basis for the allocation].)  Here, Keenan's appellate arguments fail to establish that the trial court's decision to allocate 45 percent of the settlement proceeds to future wrongful death claims was an abuse of discretion.

## DISPOSITION

We affirm.  Mrs. Hart is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

21

_____

Reardon, J.*

WE CONCUR:

_____

Needham, Acting P.J.

_____

Burns, J.

A152692

_____

* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.